STATE of Missouri, Plaintiff-Respondent,

v.

Robert C. HOWELL,
Defendant-Appellant.

No. 10185.

Missouri Court of Appeals,
Springfield District.

Nov. 17, 1976.

John C. Danforth, Atty. Gen., Preston Dean, David L. Baylard, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

Harry H. Bock, New Madrid, for defendant-appellant.

Before BILLINGS, C. J., and STONE and TITUS, JJ.

TITUS, Judge.

In accordance with jury verdicts, the trial court sentenced defendant to consecutive terms of life imprisonment for (Count I) the first degree murder of David Blankenship and for (Count II) the assault on Randy Krebs with intent to kill with malice aforethought. The crimes were allegedly committed by defendant with the use of a .38 caliber pistol shortly before midnight on Saturday, November 18, 1972, while he, Krebs and Blankenship were sitting in the latter's automobile "up on the levee" near New Madrid, Missouri.

Defendant had previously been separately charged, jury-tried and convicted of the two crimes. In the consolidated appeals from the prior convictions, the causes were reversed and remanded for new trials by the Supreme Court because the state had not sustained its burden of showing probable cause for defendant's warrantless arrest and because the trial court erred in overruling portions of defendant's motions to suppress. *State v. Howell,* 524 S.W.2d 11 (Mo. banc 1975). Following remand, an amended information was filed charging defendant with the crimes in two counts. Defendant renewed and augmented his motions to suppress evidence and the results of certain tests conducted by the state. At the conclusion of a hearing on the motions, they were overruled and the evidence and tests sought to be suppressed were admitted into

evidence over defendant's repeated objections.

■ Preliminarily we consider the state's motion to dismiss the present appeal or to strike defendant's brief for failure to comply with Rules 84.04(d), (e) and (h), V.A.M.R. We agree the rules were violated. Nonetheless, we will consider the points relied on by defendant to see if plain error affecting substantial rights was committed (Rule 27.20(c), V.A.M.R.) because of the contention that defendant's federally guaranteed rights were violated [*State v. Coyne*, 452 S.W.2d 227, 228[1] (Mo.1970); *State v. Fields*, 538 S.W.2d 348, 350[2] (Mo.App. 1976)], and the claim that the essential elements of first degree murder were not proved by the state. *State v. White*, 439 S.W.2d 752, 753[2] (Mo.1969); *State v. Alderman*, 500 S.W.2d 35, 36[1] (Mo.App.1973). Accordingly, the state's motion is denied.

At the time of his warrantless arrest on the public streets of New Madrid at 10 a. m. Sunday, November 19, defendant was bedizened, inter alia, in a long black velvet coat. This garment was seized by the officers and patches were taken therefrom for testing. The tests revealed the presence of human blood on the coat of an inconclusive type; they also revealed the coat was stained with vomit similar to vomit discovered in the automobile in which Blankenship and Krebs were found. Also after defendant's arrest, a gun residue test was done on his hands which indicated defendant had recently handled and discharged a firearm. It was held in *State v. Howell*, supra, 524 S.W.2d at 16 and 17[3], that the items seized from defendant's person and the gun residue test performed on defendant's hands after his arrest violated defendant's constitutional rights against unreasonable searches and seizures under art. I, § 15, Mo.Const., and Amends. 4 and 14, U.S. Const., unless the state could sustain its burden of showing that there was probable cause to arrest defendant before the searches and seizures took place. Defend-

ant's first point is to the effect that the trial court erred in not suppressing the evidence relating to the coat and the gun residue test because the officers had no probable cause to arrest him.

■ The constitutional validity of the searches and seizures in this case depends upon the constitutional validity of defendant's arrest. As the officers had knowledge that felonies had been committed, whether the arrest was constitutionally valid depends in turn on whether the officials, at the moment of arrest, had knowledge of facts and circumstances based on reasonably trustworthy information which would justify a prudent person in believing that defendant had committed the offenses. *State v. Perry*, 499 S.W.2d 473, 475[2] (Mo. 1973); *State v. Novak*, 428 S.W.2d 585, 591[7] (Mo.1968). Of course, an arrest may not be employed as a pretext to search for evidence [*State v. Moody*, 443 S.W.2d 802, 804[2] (Mo.1969)], and neither may the post-arrest discovery of incriminating evidence nor an ultimate conviction be relied upon to uphold the validity of an arrest. *State v. Seymour*, 438 S.W.2d 161, 162–163[2] (Mo. 1969). The factual issue of probable cause must be resolved from facts and circumstances peculiar to each particular case, bearing ever in mind the caveat that probable cause can never be satisfied with a bare suspicion of guilt. *State v. Goodman*, 449 S.W.2d 656, 660[5] (Mo.1970). Therefore, it becomes essential to learn exactly what the officers knew and did not know prior to the arrest of defendant with respect to his involvement in the shooting of Blankenship and Krebs.

*What the officers knew:*[1] Three people discovered Blankenship's car on the levee in the early morning hours of Sunday, November 19. Inside was a dead man and a wounded man who were taken via ambulance to a hospital in Sikeston. The car was removed from the levee and taken to the premises of a motor company in New Ma-

1. Although defendant argues that the officers' knowledge of facts and circumstances was not based on reasonably trustworthy information, for the purpose of this appeal we assume all information obtained by the officers was credible.

drid. The New Madrid County sheriff arrived at the motor company about 3:30 a. m. and established his investigation headquarters at that location ostensibly because the courthouse was locked. Other officers and officials arrived thereafter. To ascertain the identity of the victims, the sheriff telephoned the hospital in Sikeston, spoke to the ambulance driver and learned their names. Krebs was later taken to a hospital in Memphis and none of the officers talked with him before defendant was arrested. Two days before discovery of the crimes, i. e., Friday night, November 17, Randy Krebs, Larry Speight and Jerry Brockman were sitting in Speight's car in front of Willy Gilmore's Brotherly Love Club in New Madrid listening to taped music. Sonny Buchanan and a person then known as "Cricket" (later identified as being defendant) approached the car and inquired about the availability of marijuana. Cricket was described as "colored" with a mustache, wearing a green pantsuit and a long black velvet coat. When advised that none of the car occupants had any marijuana, either Cricket or Buchanan or both inquired about the possibility of buying some. Krebs told Cricket "he might find him tomorrow" about supplying marijuana. Cricket and Buchanan then rode in Speight's car to where they were let out near their respective residences. This was the last the officers knew of Cricket's activities. Presumably the next day, Saturday, November 18, Krebs, Blankenship (the two victims), Bill Recker and "a Mann boy"[2] went to an abandoned house "ten miles up the levee from New Madrid" to get three pounds of marijuana "that was alleged to be used to sell to" Cricket. From interviewing some of the people above mentioned, the officers also knew that none of them professed having any knowledge or information regarding the shootings, when the crimes had been committed, or the whereabouts of Cricket after Friday night.

*What the officers did not know:* What time the crimes had been committed; a description of the perpetrator or perpetrators of the crimes; information as to his or their identities, sex or activities at any time; the relationship of defendant with Blankenship, or whether defendant ever saw or was acquainted with him; defendant's relationship with Krebs, except on one occasion two days before; the activities of Cricket after he left Speight's automobile on Friday night; whether there had been any trouble or threats between Cricket and the victims; whether any physical evidence, including fingerprints, existed either within or without the car in which the victims were found that would indicate defendant or any particular person or persons had committed the crimes; whether Cricket (defendant) had on his person or at his place of residence any firearms, clothing or other objects which could connect him with the crimes; whether defendant had any residue upon his hands that would indicate he had recently handled or discharged a firearm; whether defendant was a police character or had a previous criminal record;[3] whether defendant had ever been in Blankenship's automobile; whether defendant had ever been on the levee where the crimes were apparently committed; ad infinitum.

The foregoing of what the officers knew and did not know at the moment of arrest, indicates they knew of no facts or circumstances from which they could infer a nexus between defendant and the crimes. Cf. *State v. Hicks,* 515 S.W.2d 518, 521[1–5] (Mo.1974). The knowledge that defendant, two days before the time of his arrest, had talked with Krebs about the possibility of purchasing marijuana at some future unspecified time and place would only give rise to the barest suspicion of defendant's connection with the crimes. As previously observed, bare suspicion is not enough to permit officers to make a warrantless arrest. *State v. Whorton,* 487 S.W.2d 865,

---

2. At trial it was said "Gee" Dawson, not the "Mann boy", went to get marijuana with the others.

3. But even had they known of defendant's previous criminal activities and record, if any, this would not have been sufficient knowledge to justify defendant's arrest. *State v. Cuezze,* 249 S.W.2d 373, 376[3] (Mo.1952).

867[3] (Mo.1972). In fine, we say there was no probable cause for defendant's warrantless arrest and the trial court erred in not sustaining defendant's motions to suppress and in overruling defendant's trial objections to the evidence obtained by the state through its unlawful searches and seizures. The fact that the deputy sheriff who made the warrantless arrest of defendant said he arrested defendant for "investigation," did not justify his action. "An arrest not on a legal charge but for investigation, simply to afford the police officers time and opportunity to investigate and amass facts sufficient to constitute probable cause, is not lawful. *Staples v. United States,* 320 F.2d 817 (5th Cir. 1963); *United States v. Martinez,* 465 F.2d 79, 82[4] (2nd Cir. 1972)." *State v. Hicks,* supra, 515 S.W.2d at 522[6].

■ Defendant's second point claims the trial court erred in failing to sustain his motion for judgment of acquittal (Rule 26.-10, V.A.M.R.) because "[t]he essential elements of first degree murder were not proved by the State." Otherwise stated, defendant says the evidence was not sufficient to sustain his conviction for first degree murder. When this challenge occurs, we are obliged to accept as true all evidence, circumstantial or direct, favorable to the verdict, together with all favorable inferences that can reasonably be drawn therefrom, and reject all contrary evidence and inferences. *State v. Mussman,* 526 S.W.2d 62–63[1] (Mo.App.1975). When so viewed, the trial evidence in this case (ignoring the evidence which should have been suppressed) bespeaks of the following summarization.

Trial testimony of the meeting of Krebs, defendant, et alii, at Willy Gilmore's Brotherly Love Club (a/k/a the Brotherhood Club) on Friday night, November 17, was much the same as previously recounted under defendant's first point, supra, and will not be repeated. Krebs, at the trial, testified defendant had wanted three pounds of marijuana and Krebs' asking price was $450. The following night, Saturday, November 18, at about 8 or 9 p. m., Krebs, Blankenship, Recker and "Gee"ᵢ Dawson drove in Blankenship's 2-door white Vega automobile "up on the river in the country to get the marijuana." Blankenship owned the marijuana and Krebs was to get half the profits on all he could sell. The marijuana was placed in three clear plastic bags and the quartet headed back toward New Madrid. Before reaching town the car was stopped, Krebs got out to hide the marijuana under a guardrail, and the group continued to the Brotherhood Club where Krebs found defendant. Defendant wanted the marijuana brought into the club but this procedure was vetoed. It was decided the marijuana would be taken to where defendant was living with his stepmother. Recker and Dawson were taken home leaving Blankenship and Krebs, with Blankenship driving, as the only occupants of the Vega. Being unable to determine the exact location of defendant's place of abode, Blankenship parked the Vega on a well-lit supermarket parking lot in the vicinity of defendant's house. After a 15-minute wait, defendant came up to the car and got into the rear seat. Because it was a 2-door vehicle and Krebs was sitting in the right bucket seat, it was necessary for Krebs to lean forward and tilt the back of his seat so that defendant could gain entry. The two front bucket seats were "about and foot-and-a-half or two feet" apart. Defendant seated himself in the center of the back seat.

After departing the parking lot, Blankenship drove the car to the guardrail where Krebs got out, retrieved the sacks and handed them to defendant. All the windows of the car were shut because a misty rain was falling. It was then about 11:15 or 11:30 p. m. Blankenship drove the car down the levee two or three hundred yards and stopped. Blankenship and Krebs turned around in their seats and watched defendant examine the marijuana. Krebs offered to cut his previously quoted price. As the front seat passengers turned around forward and Blankenship was at the point of driving off, Krebs heard the "noise of a shot" and lost consciousness for a short time. When he regained consciousness, Krebs sensed a movement in or of the car

so he "laid still until there was no movement and no noise and I was sure no one was there." He then saw Blankenship's body between the bucket seats of the car with his legs and lower portion of his body in toward the right front bucket seat and the upper part of his body in the back. Krebs tried to open the car door but was unable to do so because "I was paralyzed in my [right] arm and leg . . . then the next thing I remember was Harry King opening the door when he found us."

King and some friends were driving down the levee road "close" to 1 a. m. Sunday, November 19. He was acquainted with Krebs and Blankenship and was familiar with the white Vega. King saw the Vega "off on the side of the road and the lights were on." When he stopped to investigate he found Krebs and Blankenship inside the car in the positions described by Krebs. King instructed his friends to "get the sheriff and an ambulance," and waited at the scene until the ambulance arrived. Krebs was bloody and unable to talk. There was blood on the seats and floor of the Vega; also vomit.

A post-mortem examination of Blankenship's head showed a .38 caliber lead bullet had entered at the back of the skull on the right side about the level of the external opening of the right ear and was found imbedded in the front of the skull "about the level of the hairline on the left side about the level of the left eye." The gunshot wound received by Krebs was evidenced by a small opening in front of the left ear and X-ray examination disclosed that fragments from a bullet were inside his brain.

Approximately thirty minutes after defendant's arrest, Deputy Sheriff Ivy went to the home of defendant's stepmother and asked for defendant's clothing. Mr. Ivy did not enter the house and the stepmother voluntarily gave the deputy, among other things, the green shirt and green pants defendant was reportedly wearing on the Friday night prior to commission of the crimes. Again, in *State v. Howell*, supra, 524 S.W.2d at 16[2], the Supreme Court

held a search had not taken place for the green shirt and pants and that the trial court was correct in admitting these items into evidence and the results of certain tests done on them. Testing of a sample taken from the seat of the green pants revealed vomit stain similar to that found inside the Vega automobile.

■ The elements of murder in the first degree are deliberation, premeditation and malice aforethought. *State v. Anderson*, 515 S.W.2d 534, 537[1] (Mo. banc 1974). Deliberation is the matter of taking another's life in a cool state of blood or with a cool and deliberate state of mind. *State v. Jackson*, 511 S.W.2d 771, 774[1] (Mo.1974); *State v. Marston*, 479 S.W.2d 481, 484[4] (Mo.1972). Premeditation to do the act need exist only for a moment. *State v. Hammonds*, 459 S.W.2d 365, 368[3] (Mo. 1970); *State v. Booker*, 503 S.W.2d 76, 79[4] (Mo.App.1973). Malice does not connote ill will or mean spite but rather the intentional doing of a wrongful act without just cause or excuse [*State v. Smart*, 485 S.W.2d 90, 93[3] (Mo.1972)], and may be inferred from proof of an intentional killing with a deadly weapon. *State v. Mitchell*, 408 S.W.2d 39, 42[1] (Mo.1966). The elements of first degree murder may be inferred from circumstances surrounding the homicide. *State v. Sturdivan*, 497 S.W.2d 139, 142[4] (Mo.1973).

■ Defendant argues that because approximately an hour and a half elapsed from the time Krebs estimated he was shot and the victims were discovered in the car by King, there was no evidence that defendant fired the shot which killed Blankenship as there was no showing when that shot was fired. We do not agree. The state's evidence placed defendant in the back seat of the Vega (the scene of the crime) at a time reasonably related to the death of Blankenship. Krebs said that after he was shot he lost consciousness "for a short time" and that when he regained consciousness and sensed a movement in the car, Blankenship's body was lying between the bucket seats partially in the front portion of the car and partially in the back of the car. From this the jury could infer that

Blankenship was then unconscious or dead from his head wound and defendant was still in or leaving the vehicle. The path taken by the bullet as it entered and lodged in Blankenship's skull would reasonably indicate that the shot fatal to Blankenship had been fired from the rear seat of the vehicle where defendant was sitting when Krebs was shot.

In this case there was no evidence that the homicide and assault occurred at a time when defendant was aroused by some provocation to such a degree of passion as to interfere with his reason and judgment. *State v. Henderson,* 510 S.W.2d 813, 823[19] (Mo.App.1974). Also, at the time Krebs and Blankenship were shot they were seated on opposite sides of the automobile in the front bucket seats which were separated by one and a half or two feet. From this physical setting the jury could reasonably infer that the shootings were willful and deliberate, not accidental, and thus find the existence of the element of malice. With evidence of provocation lacking, the previously demonstrated willful intent to kill provided the elements of deliberation and premeditation. Accordingly, we rule there was no lack of evidence as to any of the essential elements of first degree murder.

The concluding paragraph of defendant's written argument to his second point seems irrelevant to the issue and is barely apprehensible. In effect it smacks of an assertion that testimony given by the state's gunshot expert demonstrates that the nature of the wound received by Krebs would indicate he was not shot with the same size bullet which killed Blankenship. In cross-examining this witness counsel asked if a .38 caliber bullet "entered the ear of a person, how far would it travel downward?" The witness answered: "There would be many variables in a situation for me to answer a question of a nature like that with any degree of exactness. The only thing I could do would be speculate, but in the average situation it would do massive dam-

age." We do not see how this disproves that Blankenship and Krebs were not shot with the same weapon. The shot that wounded Krebs had not "entered the ear"; it made a small opening in front of the left ear inferrably by a bullet shot at an angle from the rear. It did, nevertheless, cause massive damage. Defendant's second point relied on is denied.

■ Defendant's third and final point asseverates that as he was given a ten-year sentence for the assault upon Krebs at his first trial, the assessment of a life sentence at his second trial after the cause was reversed and remanded violated the double jeopardy clause of Amend. 5, U.S.Const., and art. I, § 19, Mo.Const. Our ruling on defendant's first point renders this point moot. Nevertheless, it is not amiss to note "that neither the double jeopardy provision nor the Equal Protection Clause [of Amend. 14, U.S.Const.] imposes an absolute bar to a more severe sentence upon reconviction" after a defendant has succeeded in getting his original conviction set aside for a new trial. *North Carolina v. Pearce,* 395 U.S. 711, 723, 89 S.Ct. 2072, 2079–2080, 23 L.Ed.2d 656, 668[13, 14] (1969). The restrictions imposed by *Pearce* against enhancing punishment on retrial do not apply, as here, where a defendant is retried by a jury and the jury fixes the sentence. *Kansas City v. Henderson,* 468 S.W.2d 48, 52[2] (Mo.1971), cert. den. 404 U.S. 1004, 92 S.Ct. 570, 30 L.Ed.2d 557 (1971); *Spidle v. State,* 446 S.W.2d 793, 795[2] (Mo.1969); *State v. Holley,* 488 S.W.2d 925, 927 (Mo.App.1972).

The judgment below is reversed and the cause is remanded for a new trial.

All concur.