STATE of Missouri, Plaintiff-Respondent,

v.

Herbert Hoover GRADY, Defendant-Appellant.

No. 37084.

Missouri Court of Appeals, St. Louis District, Division Three.

Feb. 8, 1977.

Motion for Rehearing or for Transfer Denied March 15, 1977.

Application to Transfer Denied May 10, 1977.

William J. Shaw, Public Defender, David M. Adams, Asst. Public Defender, Clayton, for defendant-appellant.

John C. Danforth, Atty. Gen., Preston Dean, Asst. Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, Courtney Goodman, Jr., Pros. Atty., Steven H. Goldman, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

KELLY, Presiding Judge.

Herbert Hoover Grady, the appellant, was convicted in a court tried case of possession of a Schedule I controlled substance —heroin—§ 195.017 RSMo. 1969, and sentenced under the Second Offender Act, § 556.280 RSMo. 1969, to twelve and one-half years in the Missouri Department of Corrections. On appeal he raises two points: (1) that the trial court erred in denying his motion to suppress evidence—heroin—seized from his person following what he contends was a search violative of his federal and state constitutional rights against unreasonable searches and seizures and (2) during the course of the trial overruling his objections to the admissibility of heroin he contends was illegally seized from his person following an unlawful search. Because we conclude that in the "concrete factual context" of this case the warrantless search was incidental to a lawful arrest, we affirm.

As in all search and seizure cases we must first carefully review the facts and the circumstances leading up to the contested search, and in reviewing what is conced-

edly a warrantless arrest and search we must be cognizant that every judicial review of such is permeated with the cardinal principle that all warrantless searches, subject to only a few well delineated exceptions, are, per se, constitutionally offensive. *State v. Peterson*, 525 S.W.2d 599, 603[2] (Mo.App.1975). Although the appellant has the burden of establishing that this search was unreasonable, nevertheless, this being a warrantless search, the burden is on the State to show that it came within one of the established exceptions to the Fourth Amendment warrant requirements to establish that the arresting officer's acts were, in fact, exempt from the rule that judges or magistrates, rather than police officers, should determine when searches should be permitted and what limitations should be placed on such activities. *Trupiano v. United States*, 334 U.S. 699, 705, 68 S.Ct. 1229, 92 L.Ed. 1663, 1669 (1948); *State v. Witherspoon*, 460 S.W.2d 281, 284 (Mo. 1970).

The facts adduced at the hearing on the Motion to Suppress conducted on December 6, 1974, before the same judge who tried the case on the merits, consisted of the testimony of the defendant (as appellant shall be hereinafter referred to) and Bobby Gentry, a police officer of the Richmond Heights, Missouri, Police Department.

The defendant's testimony, both on direct and cross-examination, is summarized as follows. He had previously been convicted in June, 1952, of five counts of delivery and sale of marijuana, in December, 1961, of two counts of sale of heroin, and at some unspecified time, of "stealing under fifty." On August 24, 1974, at approximately 2:45 p. m. while driving his 1964 Ford station wagon he was stopped by officers of the Richmond Heights Police Department. At the time he was dressed in a shirt, pants, shoes and socks. When he was stopped he was not shown any search warrant or arrest warrant but he was told that he was stopped because his car fit the description of a station wagon connected with a burglary. His station wagon had both front and rear license plates on it. The two police officers who stopped him asked for his driver's license and car registration. They did not tell him they had stopped him because he had only one license plate on his car. While the police officers were running a record check he stood and talked with them. A passenger in his car, Mrs. Mildred Bartlett, was wearing "adequate or decent clothes;" she had on a blouse which zipped up from the back and pants and they were completely on her so that no parts of her person other than her face and arms were exposed. He denied that while he was talking to the police she addressed him as "Scaggs." He admitted that during that time he had "track marks" on his arm but denied that there was any blood on the "track marks" at that time. He gave the police his correct name. After the police officers completed the record check he was told to lean on the car, put out his arms and spread his legs, and the police officer went into his pockets and emptied everything out of them. In his right front pocket he had a plastic bag containing some capsules and some tinfoil packets containing heroin. Some "currency," including a fifty dollar bill, in a wad, a red plastic coin purse full of coins and a set of keys were also seized from his person. His pockets didn't open "in the sense that they was fitting me snug." In his back pants pocket he had a bottle containing some capsules. He was not arrested until after he had been searched and then he was told that he was arrested for possession of a controlled substance. Prior to the search no arrest for a traffic violation had been discussed; he was told that if he hadn't been arrested for burglary he could go. The first time that he saw the ticket for having only one license plate was the following day, August 25th.

Officer Gentry testified for the State that he had been a store detective for one year and a police officer four years and two months on the date of the hearing (3 years and 10½ months on the date of the arrest) and that he had some training in controlled substances; that on Saturday, August 24, 1974, at approximately 2:40 p. m. he and his partner, Sergeant Zuccraello, were in a po-

lice car at the intersection of Wise and Bellevue when they first observed a car westbound on Wise Avenue with the front license plate missing. They followed the car, stopped it, and the driver alighted from the car and came to the back of the car where they conferred as to why they were stopping him. They told him they were stopping him for having only one license plate on his car. The driver of the car told them his name was Grady and that he'd been arrested once for stealing. At one point in the conversation when defendant was asked where he was going he gave no definite answer. A record check was made and showed that he was not wanted, but that he had an extensive arrest record for numerous felony type crimes, among them, burglary, possession of a controlled substance, and homicide. While he was conversing with the defendant another Richmond Heights police officer, Patrolman Whitener, came up and pointed out to Officer Gentry the "track marks" and blood on the defendant's right wrist. He also observed that the right front pocket of defendant's pants appeared to be "bulging from articles." In the meantime he had observed that the female passenger in the car was only partially dressed. She was wearing a pajama top which was unbuttoned so that it exposed her left breast and her slacks were down below her buttocks. At one point she leaned out the window and called the defendant "Mr. Scaggs." He felt an "uncertainty" about her. He didn't talk to her himself; she talked with the Sergeant. Defendant at all times appeared normal and calm.

At this time, after seeing the condition of the woman's clothing, the officer told the defendant to put his hands on the car so they could search him for their protection. He had the defendant spread-eagle against the car with his arms on top of the car and with his legs back, and while he was in this position he could see into the defendant's right front pocket where he observed a clear plastic bag containing numerous tinfoil packets. At this time he placed the defendant under arrest for "suspicion of controlled substances." After placing the

defendant under arrest, Officer Gentry began to pat him down in search of a weapon and it was at this point that he observed "numerous articles," including a hard-tip round cylinder type object in the right front pocket of defendant. He pulled the plastic bag from the pocket and handed it to Patrolman Whitener. He also took some currency and a red plastic change purse with some change in it from the same pocket. On cross-examination, Officer Gentry testified that when asked, the defendant displayed his driver's license and car registration for his car and the record check showed that the vehicle was not reported stolen and that it had a new license which was not yet on file. He placed the defendant under arrest "for suspect of possession of controlled substance" before searching him. It "wasn't completely out of his mind that the bulge couldn't be a hand gun;" it "could have been a hand gun, a silver revolver." He described the bulge in defendant's pocket as a "large bulge." And he said that all he saw was the bulge in the pocket. When the defendant leaned over, there was a weight in his pocket which caused the pocket to fall forward. The pocket was so full that he couldn't see what was under the plastic bag with the tinfoil packets in it. A medicine bottle 3½ inches high and 1½ inches in circumference was removed from the pocket. He learned that the defendant and Mrs. Bartlett lived at the same address. She didn't appear to him to be coherent. Although he didn't talk with her he could overhear her conversation with Sergeant Zuccraello.

The parties agreed that Patrolman Whitener's testimony would be cumulative and he did not testify. Sergeant Zuccraello was not called either. At the conclusion of the evidentiary hearing on the Motion to Suppress the trial court overruled the defendant's Motion. Throughout the hearing, and at the time each side argued the Motion, the record makes it clear that the basis for the trial court's ruling was the holding in *Gustafson v. Florida*, 414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973) and *United States v. Robinson*, 414 U.S. 218, 94 S.Ct.

467, 38 L.Ed.2d 427 (1973), and the belief that an "arrest" occurs every time a person is restrained of his liberty, as the trial court found defendant was when he was stopped for the traffic violation here.

Later, on April 10, 1975, the defendant filed a "Waiver of Right to Trial by Jury" and the trial was commended before the same trial judge who had heard the evidence on the Motion to Suppress and overruled same.[1] Officer Gentry was the State's initial witness and on this occasion he testified that after he and Sergeant Zuccraello stopped the defendant and advised him that he was being stopped for operating a motor vehicle with only one license plate, they questioned him and ran a record check which came back showing that the defendant had numerous arrests. Because they had observed a fairly large bulge in the defendant's right front pocket, and the disarray of the female subject inside the car, "we told Grady to place his hands on the side of the vehicle so we could search him . . ." He also testified that prior to searching the defendant he had noticed track marks on the back of the defendant's right arm and what looked like a fresh needle mark and blood spots on the back of his right hand which, from his experience, were caused from the use of narcotics of some type. He then described the search and what was recovered from the person of the defendant. On cross-examination Officer Gentry admitted that he did not know that what he had previously described as "blood" on the back of defendant's right wrist was, in fact, "blood," nor for how long the "track marks" had been on the defendant's arm. At no time did the defendant threaten the officers. Officer Gentry further testified that when the defendant's car was stopped for the traffic violation he and his partner were not looking for the defendant for any offense other than that which

they observed, i. e. operating with only one license plate.

Patrolman Whitener testified at the trial on the merits that he came upon the scene within minutes after Sergeant Zuccraello and Officer Gentry stopped the defendant and that in addition to the blood on defendant's wrist he also observed some blood on his shirt at the scene, in addition to the "track marks." Other witnesses for the State were a third Richmond Heights Police Officer, Ronald Pfeiffer, and Roger Corcoran, am employee of the St. Louis County Police Laboratory. Officer Pfeiffer's testimony was directed to some photographs of the items seized from the defendant when he was searched at the scene and he also supplied some of the links in the chain of evidence. Mr. Corcoran's testimony was directed to his chemical testing and analysis of the drugs found on the person of the defendant. He testified that the controlled substance found on the defendant totalled 24.08 grams of heroin.

After the conclusion of the trial the defendant was found guilty as charged and sentenced as previously stated hereinabove. This appeal followed.

On appeal the defendant contends that the evidence seized from his person was the fruit of an unreasonable search in violation of both his federal and state constitutional rights because the search was a warrantless search made without probable cause. The State, on the other hand, takes the position that the search followed a lawful arrest, that the evidence seized was the fruit of a search incident to a valid arrest, and therefore was properly admitted into evidence at the trial on the merits.

The alleged arrest and the search incident thereto were concededly without warrant and are therefore per se unreasonable under the Fourth Amendment unless the State can bring them within one of the well

---

1. Between the evidentiary hearing on the Motion to Suppress and the date of trial the State filed an Amended Information pleading a prior conviction of the defendant in the Circuit Court of the City of St. Louis on February 11th, 1949, of Grand Larceny; a conviction of a five count sale and delivery of marijuana in the District

Court for the Eastern District of Missouri on June 27th, 1952; and a third conviction of a single count of unlawfully selling a narcotic drug and a second count of receiving and concealing a narcotic drug imported into the United States.

delineated exceptions. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The crucial question, as the Assistant Attorney General pointed out in his argument in this Court, is: "When was this defendant arrested?"

The trial court, incorrectly we believe, concluded that the stopping of the defendant for operating a motor vehicle with only one license plate displayed in violation of § 301.130(6) RSMo. 1969, without more, authorized a full search of the person of the defendant under authority of *Gustafson v. Florida*, supra, and *United States v. Robinson*, supra. A careful reading of both of those cases reveals that in each instance the traffic violator was placed under arrest by the police officer who stopped him prior to the search and that he was orally advised of that fact prior to the search. We find that element absent here. At no time did Officer Gentry testify that he, or any other police officer at the scene, placed the defendant under arrest for the traffic violation prior to searching him. The officer unequivocally testified that he placed the defendant under arrest for "suspicion of controlled substances." There was never the "custodial arrest" for a traffic violation in this case which furnished the basis for the search incident to a lawful "custodial arrest" in *Gustafson* and *Robinson*. In Missouri the issuance of a traffic citation unaccompanied by actual restraint or taking into custody at the scene or elsewhere does not constitute an arrest under § 544.180 RSMo. 1969. *Douglas v. Buder*, 412 U.S. 430, 93 S.Ct. 2199, 37 L.Ed.2d 52 (1973). If the defendant was ever arrested for the traffic violation this record is devoid of any such evidence. The only evidence offered by the State was that after he had been arrested on the possession charge and taken to the police station he was issued a summons to answer the traffic charge. This is consistent with Rule 37.09 V.A.M.R. and the fact that the Uniform Traffic Ticket was presented to the clerk of the Magistrate Court of St. Louis County the following day. We believe that in the context of this case it is not necessary to decide whether every time a motorist is stopped for a traffic violation an arrest takes place, because it is common sense that if the defendant attempted to walk away from the police officer making the stop without first being told he might do so, he would certainly be restrained. It is also common knowledge that every time a police officer stops a person for a traffic violation he possesses the discretion to either issue a summons or take him into custody. Rule 37.09 V.A.M.R. The Missouri Uniform Traffic Ticket was adopted with this in mind authorizing the release of the operator upon his promise to appear rather than arresting him. However, until such time as the police officer announces to the person detained which avenue he shall follow, that person cannot ascertain whether he is under custodial arrest and subject to a full blown search, or whether he will be permitted to leave with only a summons to appear at a later date in a traffic court. See: *State v. Parker*, 378 S.W.2d 274, 281[7] (Mo.App.1964). There is no evidence in this case that prior to Officer Gentry's announcement to the defendant that he was under arrest on a narcotics charge that there was any intention to place him under custodial arrest for the traffic violation for which he was stopped. In fact, all of the evidence is to the contrary. We hold, therefore, that this search of the defendant cannot be based upon the *Gustafson* or *Robinson* exception.

Nor is the evidence here sufficient to bring this search within the exception carved out of the Fourth Amendment protections by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Here there are absent the suspicious circumstances which justified the pat down approved there. Officer Gentry had no reason to suspect that he was in imminent danger of being harmed. He expressed no fear of the defendant. The defendant conversed with him calmly, appeared to be normal, produced his driver's license and registration upon request, and at no time threatened anyone on the scene. The only thing which might have caused the officers some worry was the bulge in the defendant's pant pocket, but there was no testimony that there was

any suspicion it contained a weapon of any kind. Officer Gentry did testify that he did not know whether it was a gun but it was not until after he told the defendant he was under arrest on the possession charge that he made any attempt to conduct a weapons frisk, despite the fact that he had learned the defendant had at one time been arrested for homicide.

To support this contention, the State argues that there was sufficient justification for a *Terry* frisk because the officers were "dealing with an armed and dangerous user" and by reason of their knowledge of his prior homicide arrest, once having decided to frisk him for weapons, they never carried out the frisk because they saw the tinfoil packets in the plastic bag in "plain view." The State cites as authority for this position *State v. Hawkins*, 482 S.W.2d 477 (Mo.1972) and *State v. McCrary*, 478 S.W.2d 349 (Mo.1972). For reasons hereinafter stated we find neither of these cases governing the facts under the evidence here.

*Hawkins*, supra, is inapposite because there while one officer was writing up a ticket or summons for a traffic violation the other police officer went to the front of Hawkins' car to obtain a number from the city sticker affixed to the windshield. While so engaged, that officer shone his flashlight on the windshield to read the city sticker and observed in the beam of the flashlight a hand-rolled cigarette "which he reasonably believed to contain marijuana" from his past experience, on the front seat of the car. Under these circumstances the court held that there was no search because the hand-rolled cigarette was in "plain view." In this case the plastic bag and its contents were not visible to Officer Gentry until after he had placed the defendant under arrest on the possession charge and had him spread-eagled against his car in obedience to the officer's directions. Prior to the time the defendant carried out the police officer's command the contents of the defendant's pant's pocket were not in "plain view." Since, therefore, it was while obeying the police officer's orders to spread-eagle that the plastic bag and its contents

came into view, we conclude that the "plain view" doctrine as announced in *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1973) does not apply except if the arrest was based upon probable cause as we shall hereinafter decide.

*State v. McCrary*, on the other hand, although involving a traffic violation, is inapposite for the reason that there the defendant, who had been stopped and told he was under arrest for "driving without taillights," reached for his hip pocket while the arresting officer was writing out a summons or citation. In those circumstances, the officer, alarmed by the possibility that McCrary might be reaching for a weapon, grabbed McCrary's right arm and handcuffed him. When this was accomplished the officer reached into the defendant's right rear pocket and extricated therefrom two condoms of white powder which the defendant told him was heroin. Although the defendant was already under a "custodial arrest" for the traffic violation, the police officer then also arrested him for possession of heroin.

The distinguishing feature in *McCrary* is the custodial arrest for the traffic violation prior to the search and the fear of the police officer that the defendant might be reaching for a weapon. Neither of these elements is present here.

We next turn to the question whether the search of the defendant was incident to a lawful arrest, as the State contends it was. By reason of the fact that we have eliminated the search as incident to a custodial arrest for a traffic violation, the only arrest remaining for consideration is the arrest for suspicion of possession of controlled substances. Whether this arrest justified the search of necessity rests on the question whether at the time Officer Gentry arrested the defendant on the possession charge he had probable cause to make the arrest in the first place.

The State argues he did. The facts and circumstances upon which the State relies for this position are that during the course of the investigation of the traffic violation

608

for which the defendant was stopped, the police officers either learned or observed (1) that the defendant's reply to their inquiry concerning his arrest record had been less than candid inasmuch as the record check revealed that he had been arrested a number of times on different charges, including several narcotics arrests and one for homicide; (2) the strange actions of his lady passenger, addressing him as "Scaggs" when he gave his identification as "Grady", and the condition of her attire; (3) the observation of "track marks" on defendant's right arm and the fresh puncture mark and blood on his right wrist which they believed to be from a fairly recent injection of drugs; (4) the large bulge in defendant's pocket which "could have been a weapon;" and (5) observation of the plastic bag and its contents of tinfoil packets of the type heroin is usually packaged in as the defendant was spread-eagled against his car.

"Probable cause" for an arrest without a warrant exists where the facts and circumstances within the arresting officers' knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable prudence and caution to form a belief that an offense has been or is being committed. Whether there is justification for probable cause to arrest without a warrant must be determined by practical considerations of everyday life on which reasonable men act and is not to be determined by hindsight by legal technicians. The determination of probable cause for a warrantless arrest depends upon the particular facts and circumstances of the individual case and no ready "litmus test" can be applied. A broad gulf exists between what is necessary to prove one guilty and the requirement of probable cause for a warrantless arrest. *State v. Wiley*, 522 S.W.2d 281, 287[3, 6, 7, 9] (Mo.Banc 1975). Bare suspicion, however, is not enough to support a finding of probable cause for a warrantless arrest. *State v. Goodman*, 449 S.W.2d 656, 660[5] (Mo.1970), *State v. Whorton*, 487 S.W.2d 865, 867[3] (Mo.1972), *State v. Hicks*, 515 S.W.2d 518, 521[3] (Mo.1974). Nor does

the fact that the defendant had been previously arrested or had been previously convicted justify his arrest. *State v. Cuezze*, 249 S.W.2d 373, 376[3] (Mo.1952), *State v. Hicks*, supra, l.c. 521[5].

We have found no Missouri case on all points and neither party to this appeal has cited one to us. Our independent research, however, has led us to cases from other jurisdictions which have faced this problem and we have turned to them for guidance.

The Supreme Court of Colorado has considered what evidence is necessary to constitute probable cause to arrest for a narcotics violation in circumstances somewhat similar to those with which Officer Gentry was confronted when he decided to place the defendant under arrest for possession of controlled substances. In *People v. Marquez*, 183 Colo. 231, 516 P.2d 1134 (banc 1973) the defendant was "detained" following her arrival at a house known to be frequented by heroin users while a search warrant for the premises was in the process of being executed. One of the police officers during the course of her "detention" observed that the was displaying the symptoms of drug use and that she had needle marks on her arms. Her arrest under these circumstances was held to be based upon probable cause and the warrantless search incident thereto held lawful.

In *Avalos v. People*, 179 Colo. 88, 498 P.2d 1141 (banc 1972) the defendant was stopped because the taillight on her automobile was not functioning. While awaiting a report on the status of her driver's license, which she had told the police officer had expired, one of the officers noted a fresh needle mark on her right wrist. This same police officer knew the defendant from past encounters with her and also possessed information from a reliable informer as well as a fellow police officer that she was a user of narcotics. Under this factual situation the court held the police officer clearly had probable cause to affect the arrest of the defendant.

And in *Stone v. People*, 174 Colo. 504, 485 P.2d 495 (banc 1971) an officer who was a

narcotics agent learned from an informant that the defendant had been selling and using heroin, had kept a two day surveillance on the defendant when, at the conclusion of the surveillance, he was following the defendant down a one-way street as the defendant parked his car and emerged therefrom and the officer called to him by name to stop. When the defendant stopped at the curb on the other side of the street the police officer pulled his car to that side of the street and asked to see the defendant's driver's license. Immediately after making the aforesaid inquiry, but before the defendant could make any response to the officer's request, the officer noted fresh needle marks on the defendant's arm and advised him that he was under arrest. A few minutes later a search of the defendant's car revealed his wallet with a capsule of heroin lying immediately adjacent thereto in the center of the front seat. Holding that this arrest was lawful, the court, l.c. 496[1], said: "There is no question in our minds that the observation of the fresh marks, together with the background information, . . . constituted probable cause for the arrest."

The California Court of Appeals in *People v. Superior Court for County of Sacramento*, 17 Cal.App.3d 195, 94 Cal.Rptr. 643 (1971) held an arrest and subsequent search of the defendant's person did not violate the defendant's constitutional rights in a mandamus action filed by the State following suppression of evidence seized from the defendant in the Superior Court. There, the police officers went to a hotel room in the course of a narcotics investigation without any intention of arresting the occupant of the room. When the police officers knocked on the door to the room the defendant opened the door after some seconds and the police officers observed that he was exhibiting the symptoms of one who had recently injected heroin, including blood trickling down his arm. Under these circumstances, the Court held that the defendant was observed in the process of committing a crime in the presence of the police officers and the subsequent arrest of the defendant for possession of heroin for sale

was supported by probable cause. The trial court was ordered to vacate its order suppressing the evidence seized as an incident to the arrest.

The Pennsylvania Superior Court, in two cases, *Commonwealth v. Vassiljev*, 218 Pa. Super. 215, 275 A.2d 852 (1971) and *Commonwealth v. Garrick*, 210 Pa.Super. 124, 232 A.2d 8 (1967) presenting circumstances similar to those present here were reviewed on the question of probable cause for an arrest where puncture marks were observed on the arms of the defendant and led to his arrest. In each case the arrest was held to be without probable cause.

In *Commonwealth v. Vassiljev*, supra, the defendant was observed with another man passing something between them at nighttime, and as the police officers who observed this transfer between the two men approached in their patrol car both men ran. The police officers stopped the defendant, placed him in the patrol car and conveyed him to the police station. After their arrival at the police station the police officers obtained the narcotics from the defendant, and he was charged with possession of a narcotic drug. According to the evidence, when the police officers first saw the two men they thought a "strong arm robbery" was in progress and that the defendant was the victim. The reasons given by the police officer for picking up the defendant were "for investigation," because of many complaints of illegal narcotics traffic in the area, and because the defendant told the police officer he was trying to find Conshohocken. There was a conflict in the testimony of the police officer at the suppression hearing with that he subsequently gave at the trial on the merits. In the former hearing he testified that while the defendant was at the police station "a bundle of white powder fell on the floor;" at the latter, that the appellant was arrested for illegal use and possession of narcotics at the station house when the officer observed puncture marks on his arms and that the appellant was searched and the narcotics were found in his left shoe. The Superior Court held that the search could not be

justified as a weapons search under *Terry v. Ohio*, supra, and that there was no probable cause for his arrest when he was placed in the police car. In ruling on the presence of puncture marks on defendant's arms as probable cause for the arrest, the court said, l.c. 854:

> "However, puncture marks on the arm alone would not give probable cause to believe that appellant had narcotics on his person nor would they justify a belief that he was at that time using narcotics."

The court held that the narcotics found on the defendant at the station house were the product of an unconstitutional search and were not admissible against him at trial.

In *Commonwealth v. Garrick*, supra, a police officer who had seven years experience in the narcotics section of the Philadelphia police department and a member of the Special Investigations Squad specializing in narcotics was, with another police officer, sent to conduct an investigation of "illegal activities" in a section of the city. While there he observed the defendant walking down the street carrying a television set and acting in an "unusual manner," and appearing to be under the influence of narcotics. He approached the defendant and observed that "his pupils appeared dilated, and he acted in a trance state, quite calm." After the defendant was taken into custody an examination of his arms revealed recent puncture marks. A physician who examined him testified that these marks indicated recent injections and that the defendant admitted taking heroin that day. The court held that under these facts the police officer had probable cause to arrest the defendant on a charge of illegal use of narcotics.

In each of these cases where the arrest was held to be based on probable cause there was a thread of information giving the police officer probable cause to believe the defendant was engaged in drug traffic which came to him from some reliable informant or from his own personal knowledge; or, the defendant was observed either to be in the throes of symptomology

recognized by the police officer as being associated with the use of a narcotic. In most cases the police officer had specialized training in the field of drugs and was familiar with the symptoms of one under the influence of drugs.

In the instant case Officer Gentry had reliable information by way of the record check that Mr. Grady had previously been arrested on charges related to controlled substances, was obviously a user of drugs as evidenced by the "track marks" observed on Mr. Grady's right arm and the puncture wound and spot of what appeared to him to be blood on Mr. Grady's right wrist. His previous experience as a police officer made him knowledgeable of the fact that drugs are often injected into the user's wrist through a needle, leaving a puncture wound and a small amount of blood. Under these circumstances we cannot say that under the facts and circumstances within Officer Gentry's knowledge a man of reasonable prudence and caution would not form a belief that an offense involving controlled substances was not being committed. Rather, we conclude that had the officer not placed Mr. Grady under arrest and conducted the search incident thereto to ascertain whether or not an offense had been or was being committed, he would have been derelict in his duties. while it is true, as we have stated, that the mere fact that a person has been arrested or convicted of a crime, standing alone, is not sufficient to support an arrest, we believe the circumstances existing here are.

The judgment of the trial court is affirmed.

SIMEONE and GUNN, JJ., concur.