STATE of Missouri, Respondent,

v.

John ABBOTT, Appellant.

No. 10601.

Missouri Court of Appeals,
Springfield District.

Sept. 25, 1978.

Gordon Fritz, Malden, for appellant.

John D. Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

Before BILLINGS, C. J., and HOGAN and TITUS, JJ.

HOGAN, Judge.

A jury has found defendant John Abbott guilty of first-degree murder as an abettor in the killing of John Frank Holder, who was robbed and shot to death outside his liquor store near Clarkton, Missouri, during the early morning of February 24, 1976. Defendant's punishment has been fixed at imprisonment for life. He appeals.[1]

The sufficiency of the evidence is not challenged, and defendant has made no allegation of error respecting the sufficiency of the information, the verdict or the judgment and sentence. The only two assignments of error briefed by the defendant are, as stated: (1) "The Court erred in admitting as evidence the boots taken from Defendant at the time of his arrest because the arrest was illegal in that the officers did not have probable cause to believe that the Defendant had committed a crime"; and (2) "The Court erred in overruling Defendant's Motion to Suppress and [in] admitting as evidence the oral statement made by Defendant subsequent to Defend-

---

1. Defendant was charged and convicted under the homicide statutes enacted in 1975. Laws of Mo.1975, pp. 411–412, §§ 1–5, now repealed. Inasmuch as no death penalty could have been lawfully imposed under the statutes in force when the defendant was convicted, *State v. Duren*, 547 S.W.2d 476, 480[1] (Mo.banc 1977), this court has original jurisdiction of the appeal. See *Garrett v. State*, 481 S.W.2d 225, 227[3] (Mo.banc 1972).

ant's arrest for Investigation of Robbery and Murder because an arrest for investigation of a crime is not an arrest for a legal crime and is illegal." Rule 28.02, V.A.M.R. limits our review to the allegations of error briefed on appeal and we may consider only the two points briefed. *State v. Umfleet*, 538 S.W.2d 55, 60[13] (Mo.App.1976).

■ The defendant was charged on March 24, 1976. On November 17 thereafter defendant filed a motion to suppress, alleging: (1) that he was taken in custody on February 24, 1976, in connection with the murder of John Frank Holder; (2) that the officers who took defendant in custody had neither a warrant for his arrest nor probable cause to believe he had committed a crime; (3) that subsequent to defendant's arrest, the arresting officers unlawfully seized defendant's boots and took currency from his possession; and (4) that subsequent to his arrest, defendant made a statement but the statement was not, for various reasons, voluntarily made. Obviously, the defendant has shifted his ground of objection to the use of his statement in evidence; before the trial court, his objection was that the statement was inadmissible because it was *involuntary* (our emphasis); in this court, defendant's point is that the statement was inadmissable because he was unlawfully in custody. Generally, a defendant may not shift or broaden his objection to the admissibility of evidence on appeal, *State v. Jones*, 515 S.W.2d 504, 506[3, 4] (Mo.1974); *State v. Brookshire*, 353 S.W.2d 681, 688[17] (Mo.1962); *State v. Adams*, 531 S.W.2d 763, 765[4] (Mo.App.1976), and defendant's objection to admission of the statement might be disregarded because the ground of objection here is not the same as that presented in the trial court. Nevertheless, because of the gravity of the offense charged and the length of the sentence imposed, we prefer to consider the defendant's assignments of error on their merits.

■ The trial court conducted a suppression hearing prior to trial, in chambers and out of the hearing of the jury. As received, the evidence is somewhat difficult to follow, chronologically. However, in reviewing the record on the issue of probable cause, we have borne in mind: (1) that we are limited to a consideration of the facts known to the arresting officers at the time of the arrest, *State v. Hicks*, 515 S.W.2d 518, 521[1] (Mo. 1974); *State v. Kelley*, 473 S.W.2d 707, 710[3] (Mo.1971), but nevertheless (2) all the information in the officers' possession, including fair inferences therefrom, may be considered. *State v. Wiley*, 522 S.W.2d 281, 287[5] (Mo.banc 1975); *State v. Kelley*, supra, 473 S.W.2d at 709. These principles considered, the record justifies the following statement: On February 24, 1976, state and local peace officers were summoned to investigate an apparent robbery and murder at John Frank Holder's liquor store near Clarkton. The fact that no wallet was found on Mr. Holder's person taken with the fact that Mr. Holder "[was] always known for carrying large sums of money" indicated that the victim had been killed in the course of an armed robbery. Deputy Sheriff Bob McDonald, a peace officer with "over sixteen years' " experience, was one of the first officers to arrive upon the scene. He observed Mr. Holder's car parked in front of the liquor store, saw the victim "laying on the ground near his front doorsteps," saw what appeared to be a bullet wound upon the victim's person, and observed what seemed to be bullet holes "in some boards there . . . next to the doorstep."

Further investigation on McDonald's part disclosed "two sets of footprints that appeared to be [made by] boots." These footprints, or bootprints, led "from the crossroads down there southwest of the building, and of course, we tracked them . . . the fill was . . . soft and everything and we tracked them right up to the scene of the crime . . . very good footprints." McDonald testified "you could see in the footprints to where there was a slight flaw in one of the boots° . . . its got a piece off of it."

Trooper Larry Plunkett, a member of the State Highway Patrol, also participated in the investigation at the scene. Trooper

Plunkett testified at the suppression hearing that he observed footprints on the morning of February 24; the "imprints" indicated "a real heavy cord . . . [that of] a fairly new boot, around the edge of the sole." It is readily and directly inferable from the record that both officers believed the footprints were made by the high-arched, high-heeled sort of boot commonly known as a "cowboy" boot. McDonald testified that when he saw the bootprints, the defendant came to mind as a possible suspect because he knew the defendant habitually wore cowboy boots, and, some years earlier, defendant had been convicted of felonious assault upon the person of the victim's father. One Coby Edmond, "the chief of police . . . at Clarkton," "brought up" the fact that the defendant was "back in the area."

Having arrived at the Holder Liquor Store about 7:00 a. m., Deputy McDonald and Trooper Plunkett left there about 9:30 to investigate local ". . . suspects that we figured might be involved . . . ." They contacted one Charles Beck, a known associate of the defendant's, who informed the officers "that [defendant] and his brother-in-law had been to see [him] the day before about borrowing some money." This, in Deputy McDonald's words, ". . . let us know for sure that [defendant] was back in the area and apparently he was broke the day before this robbery occurred."

■ In this connection, the record of the suppression hearing has a curious aspect. Upon direct examination, Deputy McDonald was asked a number of questions about his investigation of the crime prior to the defendant's arrest. Specifically, McDonald was asked the following questions and gave the answers indicated:

"Q. Did your investigation disclose whether Wheelis (defendant's brother-in-law) and the defendant were in the Clarkton area prior to the finding of Mr. Holder dead? A. Yes, sir.

Q. What did your investigation disclose as to that? A. It disclosed that Leroy Wheelis, Jr., and [defendant] came to the Clarkton area on the afternoon before this offense taken place and that they got together with other codefendants [sic] and drove out just north of Clarkton . . . and all . . . got in one car and drove around to the northwest of Clarkton and discussed the robbery of Johnny Holder and other robberies that they might commit . . . ."

The record does not make it entirely clear when this information came to Deputy McDonald, and is utterly silent as to its source. Presumably it came from an informant; if so, he is not identified and there is no indication whether the informant or the information was reliable and for these reasons, the questions and answers quoted have been largely discounted in determining the existence of probable cause even though a peace officer may properly rely on information received from an informer if there is a substantial basis for crediting the hearsay evidence thus obtained. *State v. Wiley*, supra, 522 S.W.2d at 287–288[10].

In any event, the transcript makes it quite clear that in talking to Beck and to a Mrs. Weaver, officers McDonald and Plunkett obtained information which led them to believe defendant and his brother-in-law were living at Bernie, Missouri. The officers then contacted the chief of police at Bernie and discovered that Wheelis, the brother-in-law, had "rented a house and had a meter put into it . . . ." McDonald, Plunkett, and two other officers went to the Wheelis residence. Officers McDonald and Plunkett went to the front door, knocked, and when Wheelis came to the door, "stated our business" and ". . . asked him for permission to search [the] house." Wheelis replied ". . . that [defendant] wasn't there, he had . . . went to find some work, and that we could search [the Wheelis] house." Trooper Plunkett's version of the entry was that he and McDonald (and perhaps) one other officer knocked at the door of the Wheelis residence and were admitted to the premises. According to Plunkett, the officers asked to look around the house, and were told that would be "all right." The officers

were not asked to produce a search warrant.

In searching the house, the officers "worked [their] way back to the bathroom, at the rear of the house, and found the bathroom was locked "from the inside." Believing the defendant to be in the bathroom, the officers called for him to come out. Very shortly the defendant emerged, and as McDonald put the matter, "we noticed that he was barefooted."[2] As the defendant walked out of the bathroom Plunkett stepped inside "to make sure there wasn't a gun [in] there, looked around," and found a pair of cowboy boots. Both witnesses testified the boots "matched the prints found at the scene." Plunkett testified that he brought the boots to the door of the bathroom and showed them to McDonald. McDonald "looked at the soles [of the boots]" and placed the defendant under arrest.

As noted, the defendant has briefed two assignments of error in this court. The first point, as amplified in the "Argument" part of defendant's brief is that his boots were not admissible in evidence because: (1) the investigating officers did not have probable cause to arrest the defendant, therefore the seizure of the boots was not incident to a lawful arrest; and (2) the boots were seized prior to defendant's arrest, so even if the arrest was lawful, the boots were unlawfully seized.

█ Our courts, and courts generally, have adopted the definition of probable cause for a warrantless arrest which was laid down in *Brinegar v. United States*, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1890 (1949). Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a belief by a man of reasonable caution that the person to be arrested has committed a crime. *State v. Wiley*, supra, 522 S.W.2d at 287[1–3]. Commonly, in determining the existence vel non of probable cause to arrest, appellate courts have undertaken to lay down the specific, discrete items of information or knowledge available to the arresting officers when the arrest was made. See, e. g., *State v. Hicks*, supra, 515 S.W.2d 519 (Mo.1974) and *State v. Howell*, 543 S.W.2d 836 (Mo.App.1976).

█ The defendant invites factual comparison of this case with *Hicks*, supra, a case in which our Supreme Court found no probable cause, and *Howell*, supra, where this court found no probable cause. We decline. A factual comparison of this case with *Hicks* and *Howell* would serve no useful purpose. Unless one resorts to the technical and speculative terminology of research psychologists, there is no system of measurement by which to ascertain the order and amount of knowledge and information, or both, which constitutes probable cause to arrest without a warrant. In every case in which the existence of probable cause is in issue, the court must exercise a subjective judgment, and this conclusion is illustrated by the fact that our courts have in the final analysis resorted to the comfortable saw that ". . . [T]he determination of probable cause depends upon the particular facts and circumstances of the individual case . . ." *State v. Wiley*, supra, 522 S.W.2d at 287[6]; *State v. Goodman*, 449 S.W.2d 656, 660[5] (Mo.1970); *State v. Grady*, 548 S.W.2d 601, 608[7] (Mo. App.1977). We have recited the facts leading up to defendant's arrest in tedious detail and we are in no doubt that as soon as Deputy McDonald and Trooper Plunkett saw and examined the defendant's cowboy boots and realized that the boots had the characteristics of the boots which left the impressions in the earth they had seen earlier the same day at the Holder liquor store, they had probable cause to arrest the defendant.

█ We suppose this leads to the conclusion that the boots were seized before

---

2. Neither McDonald nor Plunkett could recall whether the defendant was wearing socks when he emerged from the Wheelis bathroom; what both officers noticed was that he wore no shoes.

the defendant was arrested; it does not follow that the boots were inadmissible in evidence. One of the well-established exceptions to both the warrant and probable cause requirements of the Fourth Amendment is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854, 855 (1973); *State v. Wells*, 550 S.W.2d 793, 796[4] (Mo.App.1977). Further, it is clear that the requisite consent to search may be given by one who has joint access or control, for most purposes, of the premises to be searched. *United States v. Matlock*, 415 U.S. 164, 171, n. 7, 94 S.Ct. 988, 992–993, 39 L.Ed.2d 242, 249–250 (1974); *State v. Johnson*, 539 S.W.2d 493, 520[66] (Mo.App. 1976), cert. denied 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977). Of course, it must be shown that the consent to search was not coerced, by explicit or implicit means, or by implied threat or covert force. *Schneckloth v. Bustamonte*, supra, 412 U.S. at 228, 93 S.Ct. at 2047–2048, 36 L.Ed.2d at 863; *State v. Pinkus*, 550 S.W.2d 829, 835 (Mo.App.1977). Here, Deputy McDonald and Trooper Plunkett carefully ascertained that Wheelis had rented the house which they searched, and had obtained utilities service for the house. McDonald very positively testified that "[W]e didn't go up [to Wheelis'] house and barge in. We didn't go in and knock the door open. We went up there and knocked on the door and [when] Mr. Wheelis came to the door, stated our business . . ." Wheelis was told that the investigating officers thought the defendant was involved in a robbery, and the officers asked for permission to search the house. Wheelis gave permission, and as the officers began their search, McDonald explained that the officers thought the defendant might be armed. Plunkett was asked if he and the other officers "ask[ed] to look around the house." According to Plunkett, Wheelis ". . . said [that] would be all right." Moreover, the record shows that the boots were taken from a commonly shared bathroom, a place wherein defendant had no reasonable expectation of privacy, except for those times when he was using the bathroom. On this record, it is manifest that the cowboy boots were the product of a valid consent search and were admissible in evidence. *State v. Pruitt*, 479 S.W.2d 785, 788 (Mo.banc 1972); *State v. Williams*, 536 S.W.2d 947, 949[4] (Mo.App. 1976).

The defendant's further point, that his arrest was a purely investigatory arrest and that any statement obtained after he was arrested should have been suppressed is little more than a play on words. During cross-examination, Deputy McDonald was asked what made him "decide to place [the defendant] under arrest." McDonald detailed a number of reasons which seemed to him to be important. Among those reasons was McDonald's belief that "whenever we found the boots in the bathroom . . . I felt like [there] was a close enough connection to the crime to arrest him for the crime to continue a further investigation." Defendant argues that his arrest was investigatory, simply to afford the arresting officers time and opportunity to amass facts sufficient to constitute probable cause, and therefore was not lawful. *State v. Howell*, supra, 543 S.W.2d at 840[6]. Invoking the colorful metaphor of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), defendant claims any statements made by him after his arrest should have been suppressed.

We cordially agree that an arrest "for investigation" without probable cause is not a lawful arrest and may not be used as a pretext to obtain evidence amounting to probable cause. For several reasons, however, we cannot agree that defendant's statements [3] constituted "poisonous fruit."

During cross-examination, having given his reasons for arresting the defendant, McDonald was also asked what he arrested defendant for after the defendant

---

**3.** The defendant made two statements after his arrest, one oral statement amounting to a confession, and one written statement later. Both statements amounted to confessions of guilt as an abettor, and on trial McDonald testified to both statements; it does not appear that the written statement was offered or received in evidence.

came out of the bathroom. McDonald unequivocally replied "[I] arrested him for the robbery and murder of John Frank Holder." McDonald also testified that at that point, he gave defendant a *Miranda* warning and handcuffed him. In this State, a defendant is under arrest when the officer takes charge of and control of his movements. *State v. Goodman,* supra, 449 S.W.2d at 661[8] (Mo.1970); *State v. Sampson,* 408 S.W.2d 84, 87[3] (Mo.1966); *State v. Stokes,* 387 S.W.2d 518, 522 (Mo.1965). The fact that the arresting officer may have characterized the arrest as an arrest "for investigation" is not controlling, if the officer had probable cause to arrest the defendant upon a charge of robbery and murder. *United States v. Story,* 463 F.2d 326, 328–329[6] (8th Cir. 1972), cert. denied 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 254 (1972). The existence of probable cause is a matter of actual fact, and McDonald's subjective opinion was not material. *Klingler v. United States,* 409 F.2d 299, 304–306[9][10][11] (8th Cir. 1969), cert. denied 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); *McNeely v. United States,* 353 F.2d 913, 918[11] (8th Cir. 1965). When Deputy McDonald took charge and control of defendant's movements, told defendant he was under arrest, read defendant a *Miranda* warning and put him in manacles, McDonald had probable cause to arrest the defendant for robbery and murder, and the trial court did not err in admitting defendant's statements in evidence.

We find no error in any respect briefed or argued in this court; accordingly, the judgment is affirmed.

All concur.