STATE of Missouri,
Plaintiff-Respondent,

v.

Patrick Edward TRIMBLE,
Defendant-Appellant.

No. 11898.

Missouri Court of Appeals,
Southern District,
Division Two.

June 8, 1983.

Motion for Rehearing or Transfer
Denied July 12, 1983.

Application to Transfer Denied
Aug. 16, 1983.

Timothy A. Braun, Public Defender, Linda Vespereny, Asst. Public Defender, St. Charles, for defendant-appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

Upon a change of venue from St. Charles County to Phelps County, a jury found defendant Patrick Edward Trimble guilty of

two counts of kidnapping as defined by § 565.110, RSMo 1978,[1] four counts of sodomy as defined by § 566.060, one count of rape as defined by § 566.030 and one count of sexual abuse in the first degree as defined by § 566.010. The jury assessed his punishment at seven terms of imprisonment for fifteen (15) years and one term of imprisonment for five (5) years. The trial court ordered that all the sentences be served consecutively. Defendant appeals.

■ The offenses charged were committed upon the bodies of two female children about 9 years of age in a marshy, wooded area northwest of the City of St. Charles in St. Charles County. One of the victims was raped; she was born October 13, 1969, and we shall refer to her as the younger child. The other victim was born September 16, 1969; she will be referred to as the older child. Having had verdicts upon each count, the State is entitled to have this court accept as true all evidence, direct or circumstantial, and all reasonable inferences therefrom which tend to support those verdicts, disregarding those parts of the record contrary to the findings of guilt. *State v. Turner,* 623 S.W.2d 4, 6[1] (Mo. banc 1981). So stated and taken, the depressing background facts of this appeal are: During the early evening of June 13, 1979, the two female children were playing in a wooded ravine alongside Ehlmann Road near its intersection with Essex Street northwest of St. Charles. They were trying to get a rope out of one of the trees in the ravine. Presently the defendant appeared, got the rope out of the tree and, for a short time, engaged in the children's play. Defendant demonstrated his skill at tying knots; finally he tied the rope tightly around one child's left wrist and the other's right wrist. Seizing the middle of the rope, defendant "pulled [the children] up through the woods" to a gravel road where his automobile was parked. The girls were told not to "cry or scream and [to] get in the car."

The children got in the back seat of defendant's four-door sedan. Defendant drove a short distance to a wooded area the girls could not identify. The children were instructed to disrobe and get out of the car. They started to comply, but another automobile "drove by" and the girls were told to get back in the automobile. They did so and were driven to a more remote area just off Hayford, or Hayford Bridge Road, northwest of St. Charles.

The defendant then got out of the car, opened the back door and took the children into a brushy area adjacent to the place where he had parked his vehicle. Defendant then ordered the children to remove the rest of their clothing and he assisted in removing their underwear.

The girls were seated on a log. The defendant "unzipped his pants," exposing his genitals. The younger child described her ordeal on direct examination as follows:

\* \* \* \* \* \*

Q. After you—after your clothes were off, then what did he do?

A. Kissed me.

Q. And where did he kiss you at?

A. Lips and breast.

Q. Okay. And what—what did he kiss you with on the breast?

A. Lips.

Q. Okay . . . what happened then?

A. . . . Made us suck on his penis.

\* \* \* \* \* \*

Q. And how did he make you suck on his penis? What did he do with his penis?

A. Just stood there and told us to do it.

Q. Okay. And where did he put it?

A. In our mouth.

\* \* \* \* \* \*

This witness was then taken "back to the car." She further testified:

Q. When you got back to the car, what happened then . . . ?

---

1. References to statutes and rules are to RSMo 1978 and to Missouri Rules of Court (11th ed. 1980), except where otherwise specifically noted.

A. Then he told me to get on the ground.

\* \* \* \* \* \*

Q. Then when he told you to get on the ground, what happened?

A. Licked me between the legs.

Q. He did?

A. Licked me between the legs.

Q. Okay. And where at between the legs, the front or the back?

A. The front.

Q. Okay. And what did he lick you with?

A. His tongue.

Q. Okay. After he did that, what happened?

A. Put his penis in me.

Q. Okay. And where did he put his penis at?

A. Same place.

\* \* \* \* \* \*

Q. What happened when he put his penis between your legs, what happened after that?

A. After? Put his finger in me.

Q. And where at in you?

A. Between the legs.

\* \* \* \* \* \*

Q. And what did you feel? What did you do when he did that?

A. I started screaming.

Q. And after he put his penis between your legs and then put his finger between your legs, then what did he do?

A. Penis.

Q. And where—what did he do with his penis?

A. Same place.

Q. Where is that?

A. Between the legs.

Q. You said you started screaming. What—what did he do when you started screaming?

A. Put his hand over my mouth.

Q. Okay. Then what happened next?

A. Told us—me and [the other child] to get our clothes.

\* \* \* \* \* \*

Q. And when you went back to get your clothes, what did [the defendant] do?

A. Left.

The other child was not quite as cruelly abused, but her testimony follows and corroborates that of her companion, which we have recited.

 In this court, the defendant has briefed and argued nine prolix and redundant points of error. As noted, the case was tried upon change of venue from St. Charles County to Phelps County. Formulating his argument in terms of due process, defendant maintains that the venue of the cause should have been changed to a more distant circuit and further argues, very abstractly, that voir dire examination is a constitutionally infirm method of determining a prospective juror's prejudice. In our view, abstract discussion of the sixth amendment right to trial by an impartial jury is unnecessary; the substantive question tendered by defendant's first three points is whether pretrial publicity created constitutionally impermissible jury partiality in Phelps County. The point has been briefed and argued on the federal precedents; we shall take the assignment as it was tendered and look to the totality of circumstances to determine whether pretrial publicity deprived the defendant of due process. *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 594 (1975).

While defendant was incarcerated in the St. Charles County jail awaiting disposition of the charges tried in this case, he made a "punk" or homosexual slave of his mentally retarded cellmate. Eventually, defendant strangled his cellmate. He was thereafter convicted of capital murder and sentenced to death. Our Supreme Court affirmed the judgment. *State v. Trimble,* 638 S.W.2d 726 (Mo. banc 1982). It may be granted that this crime generated a good deal of comment by the St. Louis metropolitan news media, principally the Newhouse and

Pulitzer organizations. In considerable part, the media coverage was the result of an effort to close the proceedings to the press. Given the circumstances, we do not find the newspaper or television comment lurid or sensational; for the most part, it is as factual and objective as one could expect. As a criminal defendant reasonably suspected of sodomizing two 9-year-old females and thereafter torturing and murdering his mentally retarded cellmate, the defendant could scarcely expect to remain anonymous. *Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344, 362 (1977).

In December 1979 the defendant filed an application for a change of venue in the Circuit Court of St. Charles County, averring prejudice throughout the Eleventh Judicial Circuit. This application was combined with a motion to suppress the victims' identification testimony. The motions came on for hearing before Honorable Donald E. Dalton, a regular judge of the Eleventh Circuit, and in the course of argument counsel for defendant addressed a wide range of topics, but we find no specific allegation that if the cause were transferred to Phelps County, defendant would be denied due process because of the bias and prejudice of possible veniremen in Phelps County. That assertion was made only after the cause had been transferred and was being heard by Honorable Eugene E. Northern, who tried the case. So, we stand in doubt that the due process issue now raised was timely preserved. See *State v. Flynn,* 519 S.W.2d 10, 12[3] (Mo.1975). Nevertheless, because of the severity of the punishment imposed, the assignment of error will be considered.

The trial began on April 15, 1980. Before the voir dire began, the court excused six members of the panel for one reason or another, and at some time during the day additional talesmen were summoned. The sequence of events is not entirely clear from the record itself but it does appear that a panel of 36 veniremen was assembled and subjected to extensive voir dire examination. There is no contention that the panel was not lawfully selected nor that any member of the panel was disqualified for any statutory reason.

We first direct our attention to those veniremen who stated they had formed an opinion concerning defendant's guilt or innocence. Veniremen Robert Nash and Mary Strickland indicated they might have a tendency to prejudge the cause. Neither suggested that it would require evidence to set aside that opinion; nevertheless challenges to both for cause were sustained by the trial court. In response to a comprehensive question put by defendant's counsel, 14 members of the panel of 36 indicated they had "heard about [the] case either by word of mouth, rumor, TV, radio, or read it in the newspapers." These veniremen were isolated and were questioned individually, one at a time, each out of the hearing of the others. Only 3 of the 14—veniremen Foote, Branstetter and Moore—were selected and sworn. We direct further attention to the attitude of these jurors.

Venireman Foote "remembered" the case because he had heard about it "back last summer sometime." He had also "noticed" a news report of the case before trial, but was unsure of the time. When he was asked if he had formed an opinion as to the defendant's guilt or innocence, Foote replied unequivocally that he had not.

Venireman L.D. Branstetter had "heard a little of it over television and a little over radio" and had "read just a little." Branstetter was asked by the court if he had ever formed or expressed an opinion as to the defendant's guilt, and was further asked if, at the present, he had an opinion as to the defendant's guilt or innocence. Branstetter answered "no" to both questions.

Venireman Harry Moore had seen a television account of the case being tried "sometime back" and had heard a radio report on his way to serve as a juror. Like Mr. Branstetter, he had not formed or expressed any opinion as to the defendant's guilt or innocence and had none at the time he was being questioned.

So, in sum, the record shows that possibly 14 or 15 of the veniremen had heard some-

thing about the defendant or his criminal record; only 3 of these veniremen were sworn; none of the 3 had formed or expressed an opinion of the defendant's guilt or innocence of the charges upon which he was being tried.

In *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961), the United States Supreme Court held that the right to a jury trial guarantees those criminally accused the right to be tried by a panel of impartial, "indifferent" jurors. Nevertheless, the court further held:

> [S]carcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.... To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (Citations omitted.)

Id., 366 U.S. at 722–723, 81 S.Ct. at 1642–1643, 6 L.Ed.2d at 756.

■ The basic premise of defendant's argument, at least implicitly, is that widespread knowledge of the accusations made against him, and of his prior convictions, in the vicinage where he was tried, was inherently prejudicial. The argument is unsound. Extensive knowledge of defendant's criminal past and of the charges made against him in Phelps County, if it in fact existed, was not sufficient of itself to make his trial constitutionally unfair. *Dobbert v. Florida,* 432 U.S. at 303, 97 S.Ct. at 2303, 53 L.Ed.2d at 362; *State v. Brookins,* 468 S.W.2d 42, 45 (Mo.1971); *State v. Owens,* 537 S.W.2d 209, 210 (Mo.App.1976). To establish constitutionally impermissible juror partiality before trial, a criminal defendant

must show that adverse publicity either prejudiced an individual juror or caused pervasive hostility within the community where he was tried. A defendant alleging prejudice occurring during the trial because of adverse publicity must make the same showing.[2] The defendant in this case has demonstrated neither individual juror prejudice nor pervasive hostility in Phelps County, and the point is without merit.

■ Defendant's points II and III are based on the same general premise as his first point, but raise slightly different questions. Defendant argues that venireman Marvin Melton should have been stricken for cause by the trial court because, being asked if having a 13-year-old daughter would "bother [him]" in serving as a juror, Mr. Melton replied "That would be hard to answer." Counsel pursued this matter on voir dire and received further equivocal answers. Citing and relying on *State v. Watson,* 595 S.W.2d 754 (Mo.App.1980), defendant argues that Melton's equivocations disqualified him and therefore he was "unconstitutionally" required to challenge Melton. The citation of *Watson* is inapt. In *Watson,* both veniremen Dody and Johnston remained equivocal, and gave equivocal answers upon being questioned by the court. The rule applicable to this case is that when a venireman gives an equivocal or otherwise uncertain answer of an ability to hear the evidence and adjudge the cause without bias or prejudice, then it becomes the trial court's duty to make some independent inquiry of qualification. *State v. Hendrix,* 646 S.W.2d 830, 832 (Mo.App.1982).

■ The trial court did so in this case. Melton was one of those questioned in isolation. He was asked directly: "Do you have an opinion at this time as to [the defendant's] guilt or innocence?" Melton's answer was "No." The trial court heard the general voir dire; it inquired directly if Melton

**2.** See *Murphy v. Florida,* 421 U.S. at 799, 802–803, 95 S.Ct. at 2036, 44 L.Ed.2d at 594, 596; *Baldwin v. Blackburn,* 653 F.2d 942, 948 (5th Cir.1981), cert. denied 456 U.S. 950, 102 S.Ct. 2021, 72 L.Ed.2d 475 (1982); *Martin v. Warden, Huntingdon State Corr. Inst.,* 653 F.2d 799, 804–806 (3d Cir.1981), cert. denied 454 U.S. 1151, 102 S.Ct. 1019, 71 L.Ed.2d 306 (1982); *Project,* Twelfth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1981–1982, 71 Geo.L.J. 339, 625 (1982).

had any preconception and received a negative answer. At most, Melton's answers reflected a feeling against sexual molestation of children rather than a preconception as to defendant's guilt. The determination of Melton's qualification was a matter for the trial court in the exercise of a sound judicial discretion. *State v. Olinghouse,* 605 S.W.2d 58, 69–70[14][15] (Mo. banc 1980). On the record before us, we cannot say that discretion was abused.

■ Defendant's third point is that he was prejudiced because the original jury panel was permitted to separate while the supplemental panel was being questioned. As noted above, several veniremen who appeared to serve were excused by the trial court and additional talesmen were summoned. The original panel was permitted to have a noon meal together. The trial court instructed the veniremen not to discuss the case while they were eating and questioned the panel collectively after it returned. There is not the slightest indication that the members of the panel discussed the case during their lunch break. There was no prejudice to the defendant. See *State v. Johnstone,* 335 S.W.2d 199, 305 (Mo.1960), cert. denied 364 U.S. 482, 81 S.Ct. 81, 5 L.Ed.2d 66 (1960).

Solely for the purpose of explication and to avoid having the point raised on rehearing, we will state that we have examined *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979). We do not read this case as does defendant's counsel; we do agree that that case does state that a trial judge has a constitutional duty to minimize the prejudicial effects of pretrial publicity. Nevertheless, it is clear from a reading of *Irvin v. Dowd,* 366 U.S. at 724–725, 81 S.Ct. at 1643–1644, 6 L.Ed.2d at 757, and *Chandler v. Florida,* 449 U.S. 560, 582–583, 101 S.Ct. 802, 813–814, 66 L.Ed.2d 740, 756–757 (1981), that the United States Supreme Court has never imposed particular, specific methods of avoiding impermissible juror partiality upon the states. For this reason, it is unnecessary to discuss abstractly the efficiency of a change of

venue or voir dire as a specific means of avoiding actual prejudice.

Defendant's second substantive point, briefed as point IV, is that the victims' in-court identification of the defendant was erroneously received because their testimony was the product of identification procedures so impermissibly suggestive as to deprive him of due process; further, defendant avers that he was denied his sixth amendment right to counsel because his attorney was not present when the older child identified him at a photographic lineup.

■ As noted, before the cause was transferred to Phelps County on defendant's application for change of venue, a hearing on defendant's motion to suppress the victims' identification testimony was had before Honorable Donald E. Dalton, a regular judge of the Eleventh Judicial Circuit. Judge Dalton denied the motion. The motion was renewed in Phelps County when the cause was tried and was repeatedly denied by Judge Northern. Generally:

> The principles that guide our inquiry are well settled. Reliability, rather than suggestiveness, 'is the linchpin in determining the admissibility of identification testimony.' *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *State v. Charles,* 612 S.W.2d 778, 780 (Mo. banc), cert. denied, 454 U.S. 972, 102 S.Ct. 522, 70 L.Ed.2d 392 (1981); *State v. Higgins,* 592 S.W.2d 151, 160 (Mo. banc 1979), appeal dismissed, 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980). In determining whether an identification is reliable, the court must consider the 'totality of the circumstances,' including [1] 'the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his prior description of the criminal, [4] the level of certainty demonstrated at the confrontation, and [5] the time between the crime and the confrontation.' *Brathwaite,* 432 U.S. at 113, 114, 97 S.Ct. at 2252–53. See *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Charles,* 612 S.W.2d at 780; *Higgins,* 592

S.W.2d at 160. Finally, '[a]gainst these factors is to be weighed the corrupting effect of the suggestive identification itself.' *Brathwaite,* 432 U.S. at 114, 97 S.Ct. at 2253.

*State v. Story,* 646 S.W.2d 68, 71[2, 3] (Mo. banc 1983).

However, we note that defendant assigns error to Judge Dalton's ruling and separately assigns error to Judge Northern's admission of the identification evidence, as if two distinct procedures were involved. Such is not the case. A ruling on a motion to suppress evidence unlawfully obtained is interlocutory, subject to change as the trial progresses. *State v. Howell,* 524 S.W.2d 11, 19[6] (Mo. banc 1975); *State v. Jones,* 646 S.W.2d 120, 122[2] (Mo.App. 1983); *State v. Pugh,* 600 S.W.2d 114, 117 (Mo.App.1980). Appellate assessment of the reliability of identification evidence must therefore be made in light of the whole record, bearing in mind that a criminal defendant is not deprived of due process unless the identification procedures used are so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *State v. Higgins,* 592 S.W.2d 151, 159[11] (Mo. banc 1979), appeal dismissed 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980); *State v. Parker,* 458 S.W.2d 241, 243–244[1, 2] (Mo.1970).

Further, in this connection, appellate review of rulings on motions to suppress is by no means de novo; although the reviewing court looks to the whole record and considers the totality of circumstances, it does not sift through the record sentence by sentence. We affirm if the trial court's ruling is supported by substantial evidence. *State v. Boggs,* 634 S.W.2d 447, 453 (Mo. banc 1982); *State v. Olinghouse,* 605 S.W.2d at 66; *State v. Alewine,* 474 S.W.2d 848, 852[4] (Mo.1971). The weight of the evidence and the credibility of the witnesses are questions for the trial court's resolution, *State v. Richter,* 647 S.W.2d 513, 519 (Mo. banc 1983); *Boggs,* 634 S.W.2d at 453, and we are not confined to the defendant's version of the facts. *Boggs,* 634 S.W.2d at 453.

Applying the five-part *Brathwaite* analysis of reliability to the record before us, we find that:

1. During the perpetration of these crimes, the victims were in the defendant's presence for an hour, perhaps longer. The older child's mother saw the witnesses' bicycles near the place where they were playing in the ditch alongside Ehlmann Road about 7:50 p.m. on June 13, 1979. She was driving home from work. Assuming the children were playing nearby, she stopped and called to them. Defendant was in the ditch but could not be seen from the road. It was then "very light" outside. The passing motorist who took the victims home after the defendant released them recalled it was "fairly light" when he stopped to pick them up. The children arrived at their parents' homes shortly before 9 p.m. The two children both had an ample opportunity to observe the perpetrator. In addition, they were not, initially, frightened or afraid of the defendant. Their identification was not unreliable for want of opportunity to observe their attacker.

2. As far as the witnesses' degree of attention is concerned, the case is similar to rape cases. The children were tied together and dragged from one place to another to be sexually assaulted. It has been said that no other crime focuses a female victim's attention upon her assailant as intensely as rape. *State v. Berry,* 609 S.W.2d 948, 954 (Mo. banc 1980); *Grant v. State,* 446 S.W.2d 620, 622 (Mo.1969). As much must be said of repeated sodomitic attacks upon elementary schoolchildren.

3. The children's physical description of their attacker, given immediately after the crimes were committed, is said by defendant's counsel to have been so grossly inaccurate as to indicate unreliability. At the suppression hearing in St. Charles County, Detective Peggy Neer testified that the younger victim, the child who was raped, described the perpetrator as a "[W]hite male. Twenty-four to twenty-seven years old [with] long black hair. Parted in the middle. [He had] acne [and] a mus-

tache." This child also described a black tattoo of a spider on the perpetrator's left wrist. At first, this victim, upon whose identification the State relied primarily, was unable to estimate her attacker's height. Later, by mental comparison to a brother 5 feet 11 inches tall, she was able to estimate his height at 6 feet.

The older child described a white male, 25 to 30 years of age with long dark brown hair parted in the middle, 5 feet 11 inches tall.

Upon trial, defendant testified that on June 13, 1979, he was 6 feet 1 inch tall, had hair "just a little above [his] shoulders" parted "in the middle." He had had a mustache on June 13. Defendant also testified he had a tattoo of a spider and a "partial cross" on his left forearm. At trial time, defendant was 19 years of age.

Counsel argues that defendant does not resemble either description given by the two complaining witnesses. In fairness, it must be said that with effort, one can find some inaccuracy in the witnesses' description of the perpetrator. Nevertheless, courts searching for indicia of reliability have not given as much credence to a victim's estimates of size, height, weight and color as they have to recollection of distinctive features such as scars, tattoos or other distinctive features. See: *United States v. Kemper,* 433 F.2d 1153, 1157, n. 29 (D.C.Cir. 1970) (inaccuracy of height and weight of little significance in view of witness' accurate recollections of scars); *Cronnon v. State of Alabama,* 587 F.2d 246, 250 (5th Cir.1979), cert. denied, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1979) (discrepancies in general description negated by witness' accurate recollection of distinctive tattoo on perpetrator's left forearm). See, generally, N. Sobel, Eyewitness Identification § 6.5 (2d ed. 1982). Here the witnesses gave a generally accurate description of the defendant. In any event, it was neither so incomplete nor inaccurate as to indicate unreliability.

4. The fourth factor to which we look is the witnesses' level of certainty. The younger child identified the defendant at a photographic lineup 4 days after the crimes were committed. Fifteen photographs were displayed. According to Detective Neer, the photographs were "stacked in front of the child, and she was asked to look through the entire stack." The child did so. Upon trial, this child testified that she picked out one photograph which "looked a little bit close" but was told to continue examining the photographs. When the child came to the defendant's photograph (before us as State's exhibit S–46), she told the officers present "that was him" except "his hair was longer." State's exhibit S–46 is indeed a picture of defendant taken approximately 2 years before the crimes here charged were committed. When this picture was taken, defendant was younger and his hair was shorter, but the photograph unmistakably portrays the defendant. Shortly after this victim identified the defendant in the photographic display, she identified him in a corporeal lineup, which we shall discuss further.

The older child was shown a photographic array on June 19. The array again consisted of 15 mug shots, but a different picture of the defendant was used, and his picture was number 10 in sequence, whereas it had been number 7 on June 17. Upon trial, this victim testified she was told to "look through [the photographs] and see if [defendant] was in there." She looked "[t]ill No. 10 and then [she] said that was him." The officers instructed her to examine the other five photographs. She did so, but remained sure the photograph was defendant's. The photograph identified by this child is before us as State's exhibit 55. It is a picture of defendant as he appeared June 17, 1979.

A photograph of the corporeal lineup at which the younger child identified the defendant is before us as State's exhibit 14. The assembled group consists of six male caucasians, five of whom are about 6 feet tall. All members of the lineup have long hair and mustaches; two have tattoos; in this picture, defendant's tattoo is concealed. Detective Neer "requested" the persons for the lineup. She asked for males about 6

feet tall who had dark brown hair and mustaches. They were to have similar "builds." Detective Sauer, who was present when the younger child viewed the corporeal lineup, testified the child was told ". . . to be sure and positive that she picked [out] the person [that] she believed was the [defendant]." She selected the defendant. We find no such degree of uncertainty on the part of either witness as to indicate unreliability. Counsel for defendant suggests uncertainty because the younger child qualified her photographic identification by saying her assailant had longer hair. The statement to which counsel refers is wrenched from its context and does not demonstrate uncertainty.

5. Finally, we have to consider the time which elapsed between the commission of the crimes and the confrontation between the witnesses and the defendant. Counsel for defendant insists that the lapse of time we must take into account is 10 months, the time which elapsed between the commission of the crimes and the trial in Phelps County. We cannot agree. In *Brathwaite,* the court used the word "confrontation" in assessing reliability, but found reliability on the basis of the short interval between the witness' initial contact with the perpetrator and his identification of the defendant from a single photograph. *Brathwaite,* 432 U.S. at 114–115, 97 S.Ct. at 2253, 53 L.Ed.2d at 154–155. Thus it may be that the noun "confrontation" does not, for purposes of *reliability* analysis, connote the corporeal presence of the defendant. Assuming, however, it does, the younger child identified the defendant at a corporeal lineup 4 days after the crimes were committed; the older child identified the defendant at a preliminary hearing on July 6, 1979, 23 days after the crimes were committed. Neither interval is so long as to indicate unreliability.

We must now look to any corrupting effect of any suggestive identification procedures. *State v. Story,* 646 S.W.2d at 71. The substance of the argument that the identification procedures used were impermissibly suggestive is first, that when the younger child was shown a photographic display on June 17, defendant's picture was very small as compared to the other photographs in the stack. Such procedure, counsel argues, focused the witness' attention on the defendant. Generally, differences in the size or color of the photographs which compose the photographic spread have been held not to infringe due process nor taint in-court identification if the reliability factors already discussed are satisfied. N. Sobel, supra, at § 5.3(a), p. 5–11. Here, the obvious purpose of the investigating officers in using an earlier photograph of the defendant was to avoid suggestiveness in the subsequent corporeal lineup. There was no undue suggestiveness nor denial of due process.

Further, defendant suggests the lineup was unduly suggestive because it immediately followed an identification from a photographic display and he was the only person who was in both the display and the lineup. Defendant relies on *Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). His reliance on that case is misplaced. In *Foster,* defendant, who was 6 feet tall, was placed in a three-man lineup; the other men were approximately 5 feet, 5 or 6 inches in height. The witness was unsure. He requested a chance to talk with Foster and was given the opportunity; nevertheless he remained uncertain. A week later, the witness viewed another lineup and Foster was the only person in the lineup who had been in the previous lineup. The United States Supreme Court held that this procedure "so undermined the reliability of the eyewitness identification as to violate due process." *Foster,* 394 U.S. at 443, 89 S.Ct. at 1129, 22 L.Ed.2d at 407.

If it is suggestive in any degree, the procedure followed here is not comparable in degree of suggestiveness to the procedure followed in *Foster.* And, assuming some degree of suggestiveness our inquiry, when denial of due process is asserted, is whether the procedures were so suggestive as to create a very substantial likelihood of irreparable misidentification upon trial.

*Higgins,* 592 S.W.2d at 159[11]; *State v. Charles,* 542 S.W.2d 606, 609 (Mo.App.1976). Further, initial identification by photograph followed by a lineup identification is not a per se violation of a defendant's constitutional rights and does not necessarily require suppression of the eyewitness identification. *State v. Burns,* 581 S.W.2d 590, 594 (Mo.App.1979); *State v. Conley,* 541 S.W.2d 4, 6[2] (Mo.App.1976).

■ It has already been observed that the investigating officers used an older picture of defendant in the photographic array to minimize repetitious emphasis upon defendant's physical characteristics. State's exhibit 14 shows that the lineup viewed by the younger child consisted of six men; five of the six men are almost the same height; two men other than the defendant have tattoos, both on the left arm. There is nothing inherently suggestive in the lineup, and in the photo picked out by the younger child just before the lineup was assembled, the defendant's appearance is appreciably different. Given the further fact that the identification was reliable by *Brathwaite* standards, there was no violation of due process in the identification procedures used in this case.

■ The final aspect of this point to be considered is defendant's contention tht he was denied his sixth amendment rights because he was without counsel at the second photographic array which was displayed to the older child on June 19, 1979. His assignment of error is limited to the assertion that his federally protected right to counsel conferred by the sixth amendment was infringed.

The point need not detain us long. Both the United States Supreme Court and the United States Court of Appeals for the Eighth Circuit have held that unlike postindictment pretrial lineups, pretrial photographic identifications, whether before or after indictment or information, do not constitute a critical stage of a criminal proceeding at which the defendant has a sixth amendment right to counsel. *United States v. Ash,* 413 U.S. 300, 321, 93 S.Ct. 2568, 2579, 37 L.Ed.2d 619, 633 (1973); *Hill v.*

*Wyrick,* 570 F.2d 748, 751 (8th Cir.1978), cert. denied 436 U.S. 921, 98 S.Ct. 2272, 56 L.Ed.2d 764 (1978). There was no violation of defendant's sixth amendment right to counsel. This court has absolutely no inclination to extend defendant's right to counsel "under the Missouri Constitution," even assuming it has the authority to do so. Cf. *State v. Quinn,* 594 S.W.2d 599, 603–604 (Mo. banc 1980).

The third substantive point briefed by defendant is his point IX, the substance of which is that his fourth amendment rights—and various others—were violated by admission of his boots in evidence. Defendant invokes the exclusionary rule on the ground that the boots were the product of an unlawful arrest.

The State argues that the point is not properly preserved. We are inclined to agree, but prefer to address the point directly; it is of some importance. On June 14, 1979, Detective Neer, the older child and the older child's mother attempted to locate the place where the crimes were committed. Commencing at the intersection of Essex and Ehlmann Road northwest of St. Charles and basing her "reenactment" of defendant's movements on what she was told by the child, Detective Neer drove generally northeast to the intersection of Elm Point Road and Hayford Road—referred to as Hayford Bridge Road—and then about a mile and a half northeast on Hayford Road to a clearing on the north side of Hayford Road.

This clearing, which resembles a picnic ground, is farm land which floods in the spring. The ground was soft. Detective Neer was able to identify footprints, or imprints in the area. Two of the imprints corresponded with the shoes the children were wearing before they were assaulted; a plaster cast was made of a larger imprint, and it was determined by Detective Neer and a St. Louis County criminal technician that the cast bore distinctive marks indicating the impression had been made by the defendant's right boot. Otherwise, the physical evidence obtained at the picnic ground and nearby tends to corroborate the

victims' accounts of their movements after they were taken from the defendant's automobile.

The defendant again relies on his argument—actually a bare assertion—that the description of the defendant given by the children to the peace officers was too fragmentary and inadequate to constitute probable cause for arrest. There is no point in recalling the details of the children's description once again; it was generally accurate. It was shown and it is true that one police officer started to take the defendant in custody about 5:30 p.m. on June 17, 1979, but did not do so because defendant did not have a "bad complexion" even though he "matched the [victims] description somewhat."

Later that same evening, Robert Eppes, a St. Charles policeman, arrested the defendant at a trailer park in St. Charles. The State argues that the following circumstances existed at the time defendant was arrested: Defendant fit the description given by one or both victims in that 1) he had dark shoulder-length hair, parted in the middle, and a light mustache; 2) he had a tattoo on his left wrist similar to the one described by the younger child; 3) he was 6 feet 1 inch tall (the size of the younger child's brother standing on tiptoe); 4) he was wearing ragged brown boots and both children described their attacker as having worn ragged brown boots. In addition, the automobile he was driving closely resembled the one described by the children. Further, he attempted to flee. Manifestly, the State argues, Officer Eppes had probable cause to arrest the defendant.

■ We agree. By and large, our courts and courts generally have adopted that definition of probable cause for a warrantless arrest which was laid down in *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1890 (1949). Probable cause to arrest without a warrant exists when the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a belief by a man of reasonable

caution that the person to be arrested has committed a crime. *State v. Wiley,* 522 S.W.2d 281, 287[1–3] (Mo. banc 1975); *State v. Abbott,* 571 S.W.2d 809, 813 (Mo.App. 1978). In this case it is particularly to be noted that the existence of probable cause is a matter of actual fact, and the first officer's subjective opinion was not material. *Klingler v. United States,* 409 F.2d 299, 304–306[9][10][11] (8th Cir.1969), cert. denied 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); *McNeely v. United States,* 353 F.2d 913, 918[11] (8th Cir.1965); *State v. Abbott,* 571 S.W.2d at 815. In our view, both officers had probable cause to arrest the defendant, but if it might be said the first officer did not, then defendant's attempted flight tipped the scales. This court has held that flight, of itself, does not constitute probable cause because one is privileged to flee from an unlawful arrest. *State v. Crum,* 536 S.W.2d 507, 510–511 (Mo.App.1976). We adhere to and reaffirm that decision. Nonetheless, in appropriate circumstances ". . . it can supply the 'key ingredient justifying the decision of a law enforcement officer to take action.' " *United States v. Bowles,* 625 F.2d 526, 535 (5th Cir.1980) (quoting *United States v. Vasquez,* 534 F.2d 1142, 1145 (5th Cir.1976), cert. denied 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976)).

■ The conclusion we reach is that the arrest was upon probable cause. The boots were seized as an incident to that arrest. As the arrest was lawful, so was seizure of the boots. The exclusionary rule does not apply. There is no merit in point IX.

Defendant has made several additional assignments of error. These points have been considered, but this court finds them so wholly without merit that a discussion and consideration of each point would only lengthen an already unconscionably long opinion. Some of the claims of error seem designed to provoke discussion, for example, defendant's assignment VIII, which, as stated in defendant's brief, is that the "trial court erred when it overruled defendant's objections to Instructions 8, 9, 10, and 11 and committed plain error when it failed to

amend Instruction 12, because [those] instructions failed to accurately define various sodomy offenses and sexual abuse offense, did not tell [the] jury essential facts necessary to authorize conviction, did not conform with [the] offenses described in bill of particulars, and thus were in violation of ... § 546.080 ... and denied defendant due process of law as guaranteed by Fourteenth Amendment of United States Constitution and Article I, Section 10 of Missouri State Constitution, and his right to be free from double jeopardy, as guaranteed by Fifth Amendment of United States Constitution."

■ When this assignment is read carefully, it becomes obvious that the key and operative averment is that the verdict-directors "did not tell essential facts necessary to authorize conviction." We brush aside the averments of constitutional error because, on this record, there is none. The State furnished the defendant with a lengthy, detailed bill of particulars. A court may look to the whole record to determine the validity of a plea in abatement based on former jeopardy. *State v. Toombs,* 326 Mo. 981, 986–987, 34 S.W.2d 61, 64 (1930). It may, if necessary, receive and consider parol evidence. *State v. Glover,* 500 S.W.2d 271, 273 (Mo.App.1973). Defendant's contention that the language of the instructions somehow forecloses a future plea of autrefois convict is without merit.

■ Counsel has in fact advanced an anachronous argument which might have raised a substantial question in pre-MAI–CR practice, viz., that the verdict-directors do not hypothesize those facts essential and necessary to a finding of guilt. It is apparent to any trained eye that in general, "definitions" as set out in MAI–CR.2d 33.01 have replaced the old "hypotheses of fact" once considered necessary to authorize a finding of guilt. We know that one of the purposes of the promulgation of Rule 20, now Mo.R.Crim.P. 28, was to eliminate unnecessary material and submit only the ultimate issue to the jury. *State v. Mares,* 486 S.W.2d 215, 216[1] (Mo.1972). A further

purpose served by pattern instructions is to avoid that endless redefinition and reformulation of settled principles according to the exigencies of the moment "[serving] to confuse rather than clarify." *State v. Abram,* 537 S.W.2d 408, 411[3] (Mo. banc 1976). It follows that when paragraph "First" of an applicable pattern instruction has been read to the jury and the terms used therein have been appropriately defined as required by MAI–CR.2d 33.01, all the facts necessary to a finding of guilt *have* been hypothesized; the jury has been told what facts it must find to authorize a conviction. See *Abram,* 537 S.W.2d at 411; MAI–CR.2d 33.00, notes on use, par. 8. We do not foreclose exceptions, but as the formulary expands, they become increasingly rare.

■ Instructions 8, 9, 10 and 11 submitted Counts IV, V, VI and VII charging defendant with several acts of deviate sexual intercourse upon the persons of the two children. Each charge was appropriately submitted on an instruction which literally followed MAI–CR.2d 20.08.2. Forcible compulsion was not submitted, therefore definition of "serious physical injury" was not required. Instruction No. 15 defined the words "deviate sexual intercourse" as follows: "Deviate sexual intercourse. Means any sexual act involving the genitals of one person and the mouth, tongue or hand of another person." Inasmuch as there was neither allegation nor proof of any anal contact, the word "anus" was properly omitted from the definition of deviate sexual intercourse. See MAI–CR.2d 33.00, Notes on Use, par. 8. We reject the suggestion that further facts "should have been" hypothesized in the language of the bill of particulars. The jury clearly understood the defendant was charged with several different offenses in distinct counts. Instruction No. 17, which is MAI–CR.2d 2.70 was sufficient to prevent confusion of one charge with another. The other instructions complained of followed MAI–CR.2d scrupulously, and the point has no merit.

■ The other assignments of error have no more substance than assignment VIII. Extensive discussion of those points

is unnecessary and would serve no useful purpose. Our constitutional mandate does not require discussion of a meritless point simply because it has been stated. *State v. Pugh,* 600 S.W.2d at 116; see *United States ex rel. Travis v. Travis,* 319 F.Supp. 380, 381[1] (S.D.W.Va.1970); *People v. Parker,* 60 Mich.App. 368, 230 N.W.2d 437, 438[6] (1975).

We find no infringement of defendant's federally protected rights in any respect briefed or argued here. We perceive neither error materially affecting the merits of the action nor plain error. Accordingly, the judgments are affirmed.

MAUS, P.J., and WM. H. BILLINGS, Special Judge, concur.