STATE of Missouri,
Plaintiff-Respondent,

v.

Ronald BROWN, Defendant-Appellant.

No. 13152.

Missouri Court of Appeals,
Southern District,
Division Two.

April 24, 1984.

Motion for Rehearing or Transfer Denied
May 14, 1984.

Application to Transfer Denied
June 19, 1984.

William M. Barvick, Jefferson City, for defendant-appellant.

John Ashcroft, Atty. Gen., William K. Haas, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

On April 3, 1981, Tommie Haynes, an inmate of the Missouri State Penitentiary, was stabbed to death. Defendant and Cornelius Dodson, also inmates, were charged with capital murder. Dodson was convicted of second-degree murder in the Circuit Court of Cole County. He appealed and the judgment of conviction was affirmed. *State v. Dodson*, 642 S.W.2d 641 (Mo.1982).

The defendant made application for a change of venue to the Circuit Court of Phelps County. The application was granted and upon trial to a jury, defendant was found guilty of second-degree murder as defined and denounced by § 565.004, RSMo 1978. His punishment was assessed at imprisonment for life as authorized by former § 565.008.2 and it was ordered that the sentence be served consecutive to the sentence he was presently serving. Defendant appealed. We have jurisdiction of the appeal. *State v. Martin*, 644 S.W.2d 359 (Mo. banc 1983).

This homicide was committed in front (on the north side) of Housing Unit No. 3 at the Missouri State Penitentiary. A corrections officer on duty at the time testified he saw the defendant, Dodson and the victim, all known to him by sight, in the yard in front of Unit 3. The officer saw the defendant and the victim running toward the entrance to Housing Unit 3. Both men had shiny objects in their hands. The officer heard a shout coming from "the direction [in which] the two inmates ... were running"; somebody shouted "Let's kill the son-of-a-bitch." The defendant was momentarily out of the officer's sight; he then saw the victim running away from Housing Unit 3, and further saw the victim run into Dodson. Dodson stabbed the victim, who dropped to one knee. The victim rose and started running again and "Brown was almost on him at that time." Defendant caught up with the victim and began stabbing him. The chase ended with the victim "flat on his belly." The defendant then started to walk away from the victim.

The victim was taken to the prison hospital where he was pronounced dead; the defendant was immediately apprehended. When the defendant was taken in custody by two corrections officers, he had a knife in his hand "just holding it up"; the officers asked the defendant for the knife but he refused to surrender it. Finally another inmate persuaded the defendant to go to "the Captain's office." This knife, which was surrendered to the Chief Internal Affairs Officer at the penitentiary, is not before us, but it was offered in evidence and the corrections officer who received it testified there were stains on the shank of the weapon which appeared to be blood.

The State also had evidence from a forensic serologist who analyzed the victim's blood. As in *Dodson*, it was shown that only about 5 percent of the population has the victim's blood type; the same type blood was found on clothing taken from the defendant after he was arrested. An autopsy was performed on the victim's body; the autopsy disclosed numerous puncture wounds which could have been caused by the weapon taken from the defendant. Such, in substance, is the background of the case.

Defendant argues that the trial court erred in refusing the testimony of Dr. John Gallagher, a sociologist, criminologist and member of the faculty at the University of Missouri. Counsel explained that:

"The purpose of [Dr. Gallagher's] testimony would be to explain conditions that exist in maximum security prisons for men in the United States. The purpose of that testimony would be to demonstrate that—let's put it this way: That in an environment where Ronald Brown was living, that the living conditions there are different from those living conditions that the jury is familiar with and that Ronald Brown's actions, his intent, his behavior can only be fairly judged by taking into account conditions under which he lived."

The court then inquired if Dr. Gallagher knew the defendant, or knew him at the time of the occurrence, or had any personal knowledge whatever of the occurrence itself. Counsel replied that his witness did not. The trial court refused to permit the witness to testify.

 The point has been earnestly argued at length, but it need not detain us long. The rules governing expert and opinion testimony are the same in both criminal and civil cases. *State v. Quilling*, 363 Mo. 1016, 1021, 256 S.W.2d 751, 752 (banc 1953); *State v. Maxie*, 513 S.W.2d 338, 344[9] (Mo.1974), cert. denied 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975). Therefore if the trier of fact is as capable of drawing conclusions from the facts proved as the proffered expert, opinion tes-

timony is not only not necessary, it is inadmissible. *Hamre v. Conger*, 357 Mo. 497, 506, 209 S.W.2d 242, 248 (Mo.1948); *Cole v. Uhlmann Grain Co.*, 340 Mo. 277, 297, 100 S.W.2d 311, 322 (1936); *Lewis v. State*, 623 S.W.2d 562, 563 (Mo.App.1981). In this case, the jury heard direct evidence of every fact and circumstance which the defendant now argues should mitigate the virulence of his intent. The jury had no need of expert testimony and Dr. Gallagher's testimony was properly excluded.

Defendant further argues that the trial court erred in refusing to strike several veniremen for cause because those veniremen stated they would not believe the testimony of a convicted felon unless it was corroborated by other sources.

The point is overstated. Our attention is called to venireman Michael Orlando, who, upon voir dire, was asked this question.

"MR. BARVICK: Let me ask you this question: Would you weigh and consider testimony of a convicted felon with the same degree of seriousness and of fairness that you would weigh and consider the testimony of any other witness in this case?"

Venireman Orlando, feeling called upon to explicate, answered:

"*Sir, I would do that.* I'm not saying that all convicted felons don't tell the truth. I'm saying that if there is a contradiction there would be—I would say I would favor the nonconvicted felon over the convicted felon; but I would take that into consideration." (Our emphasis.)

Venireman Carter, Hills, Broyles, Parry, Hamby and Rapier expressed agreement with Orlando's incomprehensible answer. For one or another reason, the other veniremen who joined in Orlando's reservation were excused, except for venireman Parry. Defendant now argues that he was denied an impartial jury.

 There can be no doubt that both sides in a jury trial are entitled to have the credibility of witnesses judged by relevant standards, and both sides are entitled to

remove for cause prospective jurors who would judge the credibility of witnesses by improper standards. *United States v. Robinson*, 485 F.2d 1157, 1159 (3d Cir.1973). However, as we have said, counsel overstates his case: Orlando's voluntary "explanation" is nothing if not equivocal, and when a venireman gives an equivocal or otherwise uncertain answer to a question about his ability to hear the evidence and adjudge the cause without bias or prejudice, it then becomes the duty of the trial court to make some independent inquiry into the venireman's qualification. *State v. Trimble*, 654 S.W.2d 245, 252[6] (Mo.App. 1983); *State v. Hendrix*, 646 S.W.2d 830, 832 (Mo.App.1982).

 The trial court did so in this case. Immediately upon hearing Orlando's equivocal answer, the court put this general question to the panel:

> "THE COURT: Let me ask the question. Members of the jury, [are] there any members of this panel that could not give—that could not take the testimony of any witness and give it such weight and value as you believe it's entitled to receive, whether it be a police officer or whether it be a prison guard or whether it be a convict? Is there anybody here who couldn't take that evidence that's presented and give it—that testimony and give it the weight and value that you believe it's entitled to receive; if so raise your hand."

No hands were raised. Thereafter, the determination of the particular juror's qualification was a matter for the trial court in the exercise of a sound discretion. *State v. Olinghouse*, 605 S.W.2d 58, 69–70[14][15] (Mo. banc 1980); *State v. Trimble*, supra, 654 S.W.2d at 252–53[7]. Contrary to counsel's suggestion, the court's method of inquiry was sufficient; it was not bound to inquire in any particular manner nor ask additional questions. Cf. *Ham v. South Carolina*, 409 U.S. 524, 528–29, 93 S.Ct. 848, 850–51, 35 L.Ed.2d 46, 50–51 (1973). We find no abuse of the trial court's discretion and no merit in the point.

A further assignment of error is addressed to the State's cross-examination of a witness, Anthony Clark. Clark was called as a witness by the defense. The general tenor of his evidence was that the victim was an aggressive homosexual who had threatened to "[p]ut [his] lights out." This meant the victim had threatened to kill him. This court, like the trial court, has had difficulty perceiving the relevance of Clark's evidence, but in any event the State contrived to suggest, on cross-examination, that Clark was in fact a homosexual "punk," i.e., the submissive or "female" member of a homosexual pair. Clark admitted previous homosexual activity in the penitentiary, but on redirect, protested his desire to "change his life" in prison. Upon recross examination, the State put the following question to the witness "Q. Well, in this—in this trying to change, when you went into the penitentiary, wasn't it for killing and sodomizing a young boy?" Counsel for defendant objected; the objection was sustained. Counsel moved the court to instruct the jury to disregard the question; the motion was granted. Counsel for defendant then moved a mistrial; this motion was denied.

 Granted that the question was improper, it does not follow that the trial court erred in failing to grant a mistrial. This court is familiar with the rule that although a witness may be impeached by showing prior convictions, it is improper to inquire into the details of the conviction. See, e.g., *State v. Zeitvogel*, 649 S.W.2d 945, 951[10] (Mo.App.1983). Nonetheless, Clark was a witness, not the defendant, and the drastic nature of a mistrial requires that it be granted only in extraordinary circumstances; the propriety of using the remedy is lodged securely in the discretion of the trial court. *State v. Morgan*, 592 S.W.2d 796, 808 (Mo. banc 1980). We find no abuse of discretion in refusing to declare a mistrial on the basis of an isolated incident of minimal consequence in the course of a long trial.

 The final point for consideration is defendant's contention that the trial court

committed plain error in permitting the State, upon summation, to argue that the defendant had asserted the defense of self-defense in a prior trial for murder.

The evidence establishing the defendant's guilt was overwhelming, and it cannot be said that the State's summation had a decisive effect upon the jury. We conclude that any error in allowing the Prosecuting Attorney to argue as he did resulted in no injustice or miscarriage of justice. The point is without merit.

We find no reversible error in any respect briefed or argued in this court and accordingly, the judgment is affirmed.

MAUS, P.J., and PREWITT, J., concurs.