STATE of Missouri, Respondent,

v.

Darren MOLITOR, Appellant.

No. 50199.

Missouri Court of Appeals,
Eastern District,
Division Four.

March 31, 1987.

Motion for Rehearing and/or Transfer
Denied May 6, 1987.

Application to Transfer Denied
June 16, 1987.

Dave Hemingway, St. Louis, for appellant.

William L. Webster, Atty. Gen., Kevin B. Behrndt, Asst. Atty. Gen., Jefferson City, for respondent.

SATZ, Judge.

Defendant was convicted by a jury of first degree murder, § 565.003 RSMo.1978

(felony-murder)[1] and was sentenced to life imprisonment. Defendant appeals. We affirm.

Defendant does not question the sufficiency of the evidence. Defendant and the victim, Mary Towey (Mary), were acquaintances. On April 12, 1983, Mary drove to the house of her friend, Cathy Molnar (Cathy), to pick up Cathy. They then picked up defendant and some other acquaintances: Warren Hutter (Warren), Marty Pezzani (Marty), Ron Adcox (Ron). They drove to Wilmore Park, where some of them smoked marijuana. The group left the park, took Warren home and took Cathy to St. Louis University. Mary then suggested they go to her house. Ron suggested they first pick up some marijuana at "Pot in the Box" across the river. They bought the marijuana and then went to Mary's house. Mary was planning a "Friday the 13th" party for the next day, and defendant hooked up Mary's stereo for the party. About 7:30 P.M., defendant, Mary and Ron drove Marty to his house. The three of them then purchased beer and liquor for the party, went by defendant's home so that he could pick up his cassette deck and tapes and, about 9:30 or 10:00 P.M., drove back to Mary's house. Defendant and Ron stayed at Mary's house all night, listening to music, consuming liquor, smoking marijuana and practicing martial arts. Mary fell asleep around 2:00 A.M.

Mary awoke the next morning about 5:30 or 6:00 A.M., showered, dressed, had coffee or tea and joined defendant and Ron. Defendant began to show Mary some martial arts moves. Then defendant and Ron began chasing Mary. Mary ran down the stairs to the basement. Defendant and Ron followed her, caught her, wrestled her to the floor and tied her hands and feet. According to defendant, they were "messing with her mind". Defendant and Ron went back upstairs. Defendant sat at the top of the stairs and drank a beer. Mary was yelling to be untied. Mary asked for a cigarette. Defendant went downstairs, lit a cigarette, "helped her smoke it" and gave her a few drinks of beer. Mary said she was cold, and, according to defendant, he and Ron unrolled a rug and put Mary on it. Mary continued to yell she wanted to be untied. Defendant found some tape and tried to tape Mary's mouth shut. He was unsuccessful. He then went back upstairs. In the meantime, Ron had located an ace bandage in the bathroom. Defendant tied a knot in the ace bandage, and, "to mess with her mind some more" or "just to possibly quiet her up some more", he tied the ace bandage around Mary's neck. He said he checked the ace bandage and found "it was loose". He went back upstairs, drank some more beer, smoked some more marijuana, listened to music and listened to Mary continuing to yell.

Subsequently, he went back downstairs and found Mary. Her feet were discolored, "sort of yellowish", her face was "purple like, black and blue", her eyes were "bulging out", and her tongue was hanging out of her mouth.

Defendant said he and Ron panicked. Leaving in the Towey's car, he and Ron took many items from the Towey house to pawn, packed Mary in the trunk and buried her in a wooded area. They then drove to Georgia. They met some acquaintances there and stayed with them in their motel. Defendant phoned his mother the following Tuesday, April 19, told her he was in Georgia and told her the last time he saw Mary she was at a party with "some bikers". On Sunday, April 22, defendant and Ron phoned home and were told FBI agents were looking for them. Ron and defendant called the FBI office in St. Louis and spoke with Agent Hoffman. FBI agents from the Atlanta, Georgia office met with defendant at the motel. Defendant was given his Miranda rights on two separate occasions. After giving two different versions of Mary's absence and death, defendant

---

1. § 565.003 RSMo.1978 reads:
   "Any person who unlawfully kills another human being without a premeditated intent to cause the death of a particular individual is guilty of the offense of first degree murder if the killing was committed in the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary, or kidnapping.
   This statute was repealed by L.1983, p. 922, S.B.No. 276, § 1.

confessed to tying the ace bandage around Mary's neck and gave the location of her body. The examination of Mary's body revealed a lesion on her head which showed "a pretty severe blow to [her] head". The cause of her death was "[m]echanical asphyxiation with cerebral anoxia, secondary to ligature strangulation". In lay terms, she died because the blood was cut off from her brain by something tied around her neck and, thus, her brain did not get enough oxygen.

At trial, defendant attempted to qualify two witnesses, Dr. Thomas Radecki and Pat Pulling, as experts on the game of Dungeons and Dragons. Defendant made offers of proof on the testimony of both witnesses. If Dr. Radecki had been allowed to testify, his opinion would have been that the game of Dungeons and Dragons "desensitizes" its players and this "desensitization" limits the players' ability to appreciate the danger and harm of their violent acts. Pat Pulling would describe the violence imagined by the players in playing Dungeons and Dragons. The trial court sustained the prosecutor's objections to both witnesses' testimony on the grounds their testimony would be irrelevant.

On appeal, defendant contends the testimony of Dr. Radecki and Pat Pulling is relevant to show defendant's "state of mind" at the time of the homicide. Defendant does not contend he suffered or suffers from a mental disease or defect excluding complete responsibility; rather, he argues, he was "desensitized" by playing Dungeons and Dragons and his "experts'" opinions on desensitization would aid the

jury in determining his state of mind at the time of the homicide. This would enable the jury, defendant argues, to determine whether defendant had the culpable mental state for capital murder or a lesser and included offense.

■ Defendant's argument is misdirected and, thus, misses the mark. Defendant focuses on the actual state of mind of an accused and points out the characteristics of the states of mind which distinguish capital murder from lesser degrees of murder.[2] Defendant, however, ignores the effect of the jury's verdict here on his argument. Defendant was charged with capital murder, § 565.001, RSMo.1978,[3] and murder, first degree (felony—murder) § 565.-003, RSMo.1978. The trial court properly instructed the jury on capital murder, felony murder and the lesser offenses of murder, second degree and manslaughter. The trial court also directed the jury to consider a lesser offense only after it had considered the next preceding greater offense. The jury convicted defendant of murder, first degree; i.e. felony-murder.

Admittedly, defendant's charge of capital murder did require proof of premeditation and deliberation for conviction. § 565.001, RSMo.1978. But defendant was not convicted of capital murder. He was convicted of the lesser offense; murder, first degree, felony—murder. Thus, defendant cannot possibly complain that the jury was kept from considering his experts' testimony about the mental state required for capital murder. Quite simply, the jury failed to

---

**2.** Defendant argues:

Under our homicide statutes, the degree of murder depends upon the state of mind of the aggressor. Deliberation distinguishes capital murder from murder in the Second Degree. *State v. Gilmore,* 650 S.W.2d 627, 629 (Mo. banc 1983). Second Degree murder comprises a willful, premeditated killing with malice aforethought. *State v. Mannon,* 637 S.W.2d 674, 679 (Mo. banc 1982). And manslaughter encompasses killings done without the other mental states of the greater degree of homicide. *State v. Smith,* 518 S.W.2d 665, 669 (Mo.App.1975).

Willfulness, deliberation, premeditation and malice aforethought all constitute concepts or

states of mind. *State v. Battles,* [357 Mo. 1223] 212 S.W.2d 753, 758 (Mo.1948), the presence or absence of which constitutes the major issue in determining the accurate degree of homicide present.

**3.** § 565.001 RSMo.1978 reads:

Any person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder.

This statute was repealed by L.1983, S.B. No. 276, § 1.

find defendant killed Mary with "premeditation" and "deliberation".

Moreover, the jury did find defendant guilty of felony-murder. More specifically, it found defendant killed Mary while committing or attempting to commit a robbery. The culpable mental state for murder, first degree when it is defined as felony—murder is supplied by the felony. *See, e.g. State v. Lindsey,* 507 S.W.2d 1, 4 (Mo. banc 1974). In this case, the felony was robbery, under 569.020 RSMo.1978. The culpable mental state for robbery is not specifically spelled out in the statutory definition of robbery. Thus, arguably, under our statutory scheme, the culpable mental state for robbery is established if the accused acted "purposely", "knowingly" or "recklessly". See § 562.021.2, RSMo.1978; *State v. Clark,* 607 S.W.2d 817, 820–821 (Mo.App.1980); *see also State v. Logan* 645 S.W.2d 60, 66 (Mo.App.1982). *But see,* § 562.026 RSMo.1978 and *State v. Helm,* 624 S.W.2d 513, 517 (Mo.App.1981). (Intoxication is no defense to robbery because robbery does not have to be "purposely" or "knowingly" done). If robbery does require a culpable mental state, defendant does not argue nor has he demonstrated that the excluded testimony of Dr. Radecki or Pat Pulling would negate that mental state.

█ Of equal, if not more, importance, defendant's offers of proof made no showing that defendant was in fact "desensitized." To the contrary, Dr. Radecki never conversed with or examined defendant; nor does it appear he even talked with defendant's family. His only knowledge about the homicide comes from an undefined conversation with defense counsel and a brief undescribed newspaper article that he read some months prior to the trial. With no personal knowledge to support Dr. Radecki's opinion about defendant's mental state, his testimony was properly excluded by the trial court. *See, e.g., State v. Lint,* 657 S.W.2d 722, 725 (Mo.App.1983); *see also, State v. Brown,* 669 S.W.2d 620, 622 (Mo.App.1984).

Defendant argues, however, that he cured this defect by asking Dr. Radecki a hypothetical question based upon facts established at trial, and Dr. Radecki, as an expert, should have been permitted to answer this question. Defendant's argument is not persuasive.

For our purposes here, we shall assume defendant laid a proper factual foundation for his hypothetical question. The question was:

> [A]ssume that we have two 18–year-olds, a male and a female. Previously, the female has invited several people to a Friday the 13th party. Both individuals are participants in [Dungeons and Dragons]. Assume further that the 18–year-old female and the 18–year-old male become involved in a wrestling activity. The 18–year-old male ties the female up. Assume further that in addition to tying the female up, the 18–year-old male places around her throat a ligature—in this hypothetical, an Ace bandage.

> ·   ·   ·   ·   ·

> [W]hat would be your opinion as to whether the activities that I've described could be an offshoot of the fantasy role-playing of [Dungeons and Dragons].

The Doctor, quite candidly, responded that he could not tell what defendant's "intent" would be. Specifically, he answered:

> The tendency toward that type of behavior could very certainly be increased by D & D play. *What the intent of the young male at the time of the incident is, you know, is a different question and I wouldn't have any knowledge of that.* But the tendency towards that type of behavior could certainly very easily be increased by D & D played, especially when the two people have played together. There's more of a desensitization of playing with violence between the two of them and it's certainly possible that—you know, it's certainly likely, indeed, that there is a desensitization towards playing with violence or even commission of intentional violent behavior between the two. *I don't have any knowledge of the particulars of the intent in this case.* (emphasis added).

This answer clearly shows Dr. Radecki's inability to apply his perception of the general effect of playing Dungeons and Dragons to the particularized mental state of defendant here. Moreover, he could not and did not state the possible effect on defendant was the cause of defendant's acts. Given this offer of proof, the trial court was well within its discretion in rejecting Dr. Radecki's testimony as being irrelevant. *E.g. State v. Guyton*, 635 S.W.2d 353, 360 (Mo.App.1982); *State v. Taylor*, 589 S.W.2d 302, 304 (Mo. banc 1979).

Pat Pulling's proffered testimony suffered from the same or greater defects. She never talked to defendant, nor his family. The primary purpose of Pulling's testimony was to describe the level of imagined violence in Dungeons and Dragons and how the players become addicted to it. However, with candor equal to Dr. Radecki, she said "she did not come out here to say Dungeons and Dragons was the cause of this case." Thus, defendant's argument has no merit.[4]

Defendant next contends the prosecutor's "death qualification" of prospective jurors deprived him of his right to a jury from a fair cross-section of the community. During voir dire, five prospective jurors said they would be unable to impose the death penalty under any circumstances. Over defendant's objections, the trial court struck these prospective jurors for cause.

■ The state may strike for cause prospective jurors who cannot consider death as a possible punishment. See *State v. Foster*, 700 S.W.2d 440, 443 (Mo. banc 1985); *State v. Malone*, 694 S.W.2d 723, 726, 727 (Mo. banc 1985). The United States Supreme Court agrees. *Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986). Thus, defendant's argument has no merit.

Defendant also argues the court improperly admitted the tape recording of a telephone conversation between defendant and FBI Agent Hoffman. Hoffman and other FBI agents entered the case after Mary had been reported missing. On April 22, 1984, Ron's mother phoned Hoffman to ask whether he would accept a collect phone call from her son. Hoffman received the call from Ron and talked with him and then talked to defendant. This conversation was taped.

Defendant's complaint about the admission of this taped conversation is neither clear nor explicit. Defendant argues the state failed to show defendant's statement on the tape was not induced by threats or promises and, therefore, a proper foundation was not laid for the admission of the tape. Defendant relies on *State v. Spica*, 389 S.W.2d 35, 43–46 (Mo.1965).

Defendant's reliance on *Spica* is misplaced. In *Spica*, the court was addressing the propriety of admitting a criminal defendant's taped conversation, which was taped without his knowledge. The Court set out a seven point foundation for admitting the tape.[5] Six of these points were directed to the reliability of the recording itself and the seventh point was directed to

---

4. We do not address whether defendant established that the relevant scientific community has accepted the theory of "desensitization" by playing Dungeons and Dragons. *See, Alsbach v. Bader*, 700 S.W.2d 823, 828–29 (Mo. banc 1985).

Although at oral argument defendant argued to the contrary, his "desensitization" defense is strikingly similar to "diminished mental capacity or partial responsibility". See 552.015.2(8), RSMo. (Supp.1987); *State v. Strubberg*, 616 S.W.2d 809, 816 (Mo. banc 1981). Defendant, however, did not give the state notice of this defense. We do not address the necessity of doing so. *See, State v. Alexander*, 693 S.W.2d 216, 222–223 (Mo.App.1985).

5. The foundation referred to in *Spica* contains the following elements:

(1) A showing that the recording device was capable of taking testimony,
(2) a showing that the operator of the device was competent,
(3) establishment of the authenticity and correctness of the recording,
(4) a showing that changes, additions, or deletions have not been made,
(5) a showing of the manner of the preservation of the recording,
(6) identification of the speakers, and
(7) a showing that the testimony elicited was voluntarily made without any kind of inducement.

Later cases question this dicta. *See, e.g. State v. Molasky*, 655 S.W.2d 663, 668 (Mo.App.1983).

the trustworthiness of the statement itself: "(7) a showing that the testimony elicited was voluntarily made without any kind of inducement". *Id.* at 44. Thus, the real thrust of defendant's complaint is not against the admission of the tape itself; but rather it is against the admission of the contents of defendant's statement. Defendant's real argument is that he was improperly induced into making incriminating statements by Hoffman "denigrating" the *Miranda* warnings which were given during the phone conversation. We disagree.

 Agent Hoffman did not initiate his conversation with defendant. Hoffman accepted Ron's phone call. Defendant voluntarily took the phone from Ron and began to talk. Defendant obviously was not "in custody". His liberty was not restrained, and defendant made no showing he was at that time the focus of a homicide murder inquiry. Thus, the *Miranda* rights are inapplicable. *E.g. State v. Calmese,* 628 S.W.2d 382, 387 (Mo.App.1982); *Oregon v. Mathieson,* 429 U.S. 492, 493–496, 97 S.Ct. 711, 713–14, 50 L.Ed.2d 714 (1977). If the *Miranda* rights are inapplicable, their alleged "denigration" is irrelevant.

Moreover, statements of an accused obtained through subterfuge are admissible unless the deception offends societal notions of fairness or is likely to procure an untrustworthy confession. *State v. Evans,* 676 S.W.2d 324, 327 (Mo.App.1984); *State v. Pugh,* 600 S.W.2d 114, 118 (Mo.App. 1980). Hoffman gave defendant his Miranda rights with reference to a possible Dyer Act violation, because he drove the Towey's car across state lines. We have read the transcript of the entire taped conversation, however, especially those parts emphasized in defendant's brief, and find Hoffman's conversation was friendly and not deceitful. Defendant apparently thought so too and, thus, did not hang up on Hoffman.

Furthermore, defendant took the stand and described his actions in detail. In addition, defendant's signed statement describing his actions and another taped statement describing his actions were ad-mitted into evidence. This evidence cures any possible error caused by the admission of defendant's taped conversation with Hoffman.

Judgment affirmed.

CRANDALL, P.J., and PUDLOWSKI, J., concur.