**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Antonio EVANS, Defendant-Appellant.**

No. 47350.

Missouri Court of Appeals,
Eastern District,
Division Twelve.

Sept. 4, 1984.

Claude Hanks, Creve Coeur, for defendant-appellant.

John Ashcroft, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

DOUGLAS W. GREENE, Special Judge.

Defendant, Antonio Evans, was jury-convicted of first degree murder and sentenced to life imprisonment.

In his sole point relied on in his appeal, Evans contends that the trial court erred in denying his motion to suppress, and in permitting his videotaped confession to be admitted in evidence. It is defendant's position that his confession was obtained by artifice and deception and was, therefore, inadmissible, citing *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *State v. Pugh,* 600 S.W.2d 114 (Mo.App.1980), as authority for his position.

Although the sufficiency of the evidence has not been questioned, it is necessary to relate a few basic facts in order to properly evaluate the contention of Evans raised here.

Richard Cunningham was shot to death in the early morning hours of October 30, 1982. Cunningham was killed in his automobile which was found at 1277 Ryan Terrace in Wellston, Missouri. Immediately prior to the shooting, Cunningham had been wearing three rings, one a marquise cut diamond, the second a 14-carat gold ring with a nine-chip diamond cluster, and the third an 18-carat white gold band. When his body was found, the rings were missing.

The police interviewed Cunningham's girl friend, Patricia Berger, who told them Cunningham was involved in drug dealings with Charles Shurn. She also said that about midnight on October 29, Cunningham was to go to the home of Shurn, who lived a short distance from where the body was found, to complete a drug transaction in which Cunningham was to give Shurn money to buy drugs. The police later went to Shurn's home and knocked at the door.

After a period of 20–25 minutes, the door was opened by Thomas Weeks. Upon entering, the police discovered a .38 caliber revolver that had been thrown in the fireplace, and a number of aluminum foil packets that appeared to contain illegal drugs. Weeks, upon being questioned, indicated that he did not know anything "about no murder" and told them that Shurn and Evans were also in the house.

Shurn was found on the second floor. He was lying on a mattress and "appeared to be sleeping." He was wearing one of Cunningham's rings. Shurn was awakened and advised that he was under arrest for murder. Shurn told the arresting officer "he didn't know anything about no murder that took place over on Ryan Terrace, and he told me that Tone [sic] was with [Cunningham] all night and he must have killed him. He told me to check with Tone." By "Tone," Shurn meant Antonio Evans.

Evans was found hiding in the attic. He was fully clothed and lying on a mattress. The other two rings belonging to Cunningham were found partially under a rug within arms reach of Evans. Evans was arrested at the time and advised of his constitutional rights as elucidated in *Miranda v. Arizona,* supra. Evans was then taken to the Seventh District Police Station and booked in. He was again advised of his constitutional rights, and Evans said that he understood his rights. At that time, Evans said the two rings found under the rug were his, that he had possessed them for a long time and that he wanted them back.

The investigation continued. One of Evans' fresh fingerprints was lifted from the window glass of the front passenger door of Cunningham's automobile, which was found at the scene of the murder. The police also interviewed Sterling Stovall who stated that he was at Shurn's home in the early morning hours of October 30, and that when Stovall left at about 3:30 A.M., Cunningham, Shurn and Evans were still in the house.

At approximately 9:45 P.M. on October 30, Evans was booked into the Wellston police station. Willie E. Ealy, Director of the Wellston Police Department, questioned Evans the next morning, after again reading Evans his *Miranda* rights. Evans said that he understood his rights, and signed a form waiving those rights. Evans then told Ealy that "he wanted to cooperate; he wanted to clear himself." Evans then told Ealy that he had been at the home of Charles Shurn about 4 A.M. on the morning of October 30, and at that time heard Shurn and a man by the name of Ferrell Stamps discuss how they had robbed and killed Cunningham. Evans agreed to go to the St. Louis County prosecuting attorney's office to give a statement to that effect, and to testify, if need be, as a state's witness at time of trial.

After placing Evans back in a jail cell, Ealy went to the home of Ferrell Stamps. Stamps was not at home, but Ealy talked to his live-in girl friend, Diane Shores. Diane told him that on Friday evening, October 29, she had overheard, Shurn, Stamps, and an unidentified third person discuss how they were going to rob Darryl Cunningham. She said they were going to "pop him if he came over with the money." Diane agreed to go to the prosecuting attorney's office to give a statement.

At about 1:30 P.M., Ealy again advised Evans of his rights and released him from jail. After talking to his mother, Evans went with Diane Shores, Ealy and another police officer to the prosecutor's office. Evans was not restrained and was left in the waiting room with Diane, while Ealy talked to an assistant prosecuting attorney, presumably to tell him the details of the investigation. While waiting for Ealy to return, Evans told Diane that he had lied to the police, and that he (Evans) was the one who had killed Cunningham. During an absence of Evans, who had gone to the bathroom, Diane advised Sergeant Ealy of the admission of Evans of the killing. It was then decided by law enforcement authorities to videotape the questioning of Evans.

Frank Selvaggio, a county police officer, was to tape the interview which was conducted by Ealy. At the beginning of the interview, Ealy again advised Evans of his rights, which Evans said he understood. In response to questions, Evans stated that he had heard Shurn and Stamps talking about how they had robbed and killed Cunningham, and that Shurn had hidden Cunningham's rings when the police came. Evans further stated that he was not present when Cunningham was shot. Ealy then told Cunningham that he had good reason to believe Evans had shot Cunningham. He also told Evans that his fingerprint had been found inside Cunningham's car. Evans said that was not possible as he had not been in Cunningham's car in over a week. Ealy then concluded the interview.

As Selvaggio was starting to dismantle the taping equipment, Evans spontaneously remarked that the reason his fingerprint had been found in Cunningham's car was because he had ridden in it the night of the murder with the victim and Shurn. Selvaggio reset the machine to record and went to the next room to request that Clayton Police Officer Kevin Murphy finish taping the statement, which Murphy did. The first part of Evans' statement took about 15 minutes. The gap between the Selvaggio taping and the Murphy taping took about two minutes, and the Murphy taping took "somewhere in the area of a half-hour or better." There was some testimony that the entire interview process took more than one hour.

During part of the interview taped by Murphy, Evans at first admitted being at the murder scene, and said that Shurn killed Cunningham after robbing him of the drug money and rings. Evans finally admitted that he, and not Shurn, had shot and killed Cunningham. The videotaped confession was shown to the jury, over the objection of Evans. Evans was 17 years old at the time of the murder. All of the participants, as well as the victim, named in the statement of facts, with the exception of Selvaggio and Murphy, are black. There is substantial evidence in the record

that Evans was not beaten, threatened, abused, or coerced in any way by any police officer before or during the interview in question.

■ The thrust of defendant's contention raised here is that his fifth amendment right to counsel was waived as a result of trickery and subterfuge, in that he thought he was going to give a statement incriminating Shurn and Stamps when, in truth, the police were seeking admissions from Evans that he was the killer. The argument is novel, but not persuasive. While it is true that *Miranda v. Arizona,* supra, 384 U.S. at 475–476, 86 S.Ct. at 1628–1629, opines that evidence that an accused is threatened, tricked, or cajoled into a waiver will render the waiver involuntary, it is equally true that confessions obtained through subterfuge are admissible unless the deception is such as to offend societal notions of fairness, or is likely to procure an untrustworthy confession. *State v. Pugh,* 600 S.W.2d 114, 118 (Mo.App.1980). We find nothing in the record, including the video-taped confession which has been viewed by this court, to indicate that the failure to tell Evans that Diane Shores had told the police Evans had confessed the killing to her before the interrogation commenced resulted in fundamental unfairness to Evans, or made it more likely that his subsequent confession was untrustworthy.

Evans had been advised of his constitutional rights at least four times before the interrogation in question. Even though he had been told, in good faith at the time, that he was going to the prosecuting attorney's office to give a statement implicating Shurn and Stamps, Evans knew he was a suspect in Cunningham's killing, knew during his taped interview that his exculpatory statement was not believed, and knew that the interrogating officer, Sergeant Ealy, believed him to be the murderer of Cunningham. In addition, Evans initiated the portion of the interview in which he ultimately confessed by volunteering to Ealy, after the initial interview was over, that he had lied about the fingerprint, and that he had really been in Cunningham's car the night of the murder.

■ Whether a confession is voluntary is judged by the totality of the circumstances. *Boulden v. Holman,* 394 U.S. 478, 480, 89 S.Ct. 1138, 1140, 22 L.Ed.2d 433 (1969). If a preponderance of the evidence indicates that a confession was freely and voluntarily given, after a knowing and intelligent waiver of the suspect's constitutional right against self-incrimination, the confession is admissible in evidence. *State v. Brydon,* 626 S.W.2d 443, 448–449 (Mo.App.1981).

■ The evidence given at the motion to suppress hearing, at trial, and in the video-taped confession establishes conclusively that Evans' confession was freely and voluntarily given, after a knowing and intelligent waiver of his constitutional rights.

The trial court was correct in its rulings denying the motion to suppress and overruling the objection to the admission into evidence of Evans' videotaped confession. We find no error.

Judgment affirmed.

SNYDER, J., and DONALD BARNES, Special Judge, concur.